DRINKER BIDDLE & REATH LLP
*A Delaware Limited Liability Partnership*
500 Campus Drive
Florham Park, New Jersey  07932-1047
(973) 360-1100
(973) 360-9831 (facsimile)
*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EASTERN REGIONAL COMMUNICATIONS, INC., d/b/a MOJO WIRELESS, | Civil Action No. |
| Plaintiff, | Hon. |
| v. | **NOTICE OF REMOVAL** |
| AT&T MOBILITY LLC, | (Document Electronically Filed) |
| Defendant. | |

TO:    CHIEF JUDGE AND JUDGES OF THE
        UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF NEW JERSEY

ON NOTICE TO:

      Clerk, Superior Court of New Jersey
      Morris County Courthouse
      Washington & Court Streets, P.O. Box 910
      Morristown, New Jersey 07963

      Martin A. Newmark, Esq.
      Broderick, Newmark & Grather, P.C.
      20 South Street
      Morristown, New Jersey 07960
      *Attorneys for Plaintiff*

**PLEASE TAKE NOTICE** that Defendant AT&T Mobility II LLC, incorrectly named in

the complaint as AT&T Mobility, LLC, by and through its counsel, Drinker Biddle & Reath

LLP, hereby removes this civil action to the United States District Court for the District of New

Jersey, pursuant to 28 U.S.C. § 1441 and § 1446, as amended, and in accordance with 28 U.S.C. § 1332, on the following grounds:

1.      On or about March 20, 2009, plaintiff Eastern Regional Communications, Inc. d/b/a Mojo Wireless ("Plaintiff") commenced a civil action against Defendant in the Superior Court of New Jersey, Chancery Division, Morris County, Docket No. C-41-09 by filing a Verified Complaint and Order to Show Cause.  True and complete copies of the Complaint, the proposed form of the Order to Show Cause, and Plaintiff's letter-brief in support its request for temporary restraints are annexed hereto as Exhibits 1, 2, and 3, respectively.

2.      Plaintiff's counsel e-mailed a copy of the Complaint, the proposed form of the Order to Show Cause, and Plaintiff's letter-brief to the undersigned counsel for Defendant on March 20, 2009.  Defendant hereby waives formal service of the Complaint.

3.      Plaintiff is a citizen of the State of New Jersey because it is a corporation organized under the laws of the State of New Jersey and its principal place of business is located at 106 S. State Street, Hackensack, New Jersey. See Compl. ¶ 1.

4.      Defendant is a Delaware Limited Liability Company with headquarters in Atlanta, Georgia.  As a limited liability company, Defendant's citizenship is determined by the citizenship of its members.  Defendant's members are citizens of the States of Delaware, Georgia, Texas, and New York, thus Defendant is a citizen of Delaware, Georgia, Texas, and New York.

5.      Plaintiff's Complaint alleges a violation of the New Jersey Franchise Practices Act, N.J.S.A. 56:10-3, and seeks equitable relief in the form of a temporary restraining order, specific performance, money damages, attorneys' fees, interest and costs.[1]

---

[1] Plaintiff acknowledges that the merits of the parties' dispute is subject to a contractual dispute resolution procedure, which ultimately provides for mandatory binding arbitration.

6.     The value of the injunctive relief Plaintiff seeks alone exceeds $75,000. See, e.g., Compl. ¶ 25.

7.     Inasmuch as complete diversity exists between the parties and the amount in controversy in this matter exceeds $75,000, exclusive of interest and costs, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

8.     This case is thus removable under 28 U.S.C. § 1441.

9.     This Notice of Removal is filed within the time prescribed by 28 U.S.C. § 1446(b).

10.     A copy of this notice promptly will be filed with the Clerk of the Superior Court of New Jersey, Chancery Division, Morris County, and served on Plaintiff, pursuant to 28 U.S.C. § 1446(d).

**WHEREFORE**, Defendant hereby removes this action from the Superior Court of New Jersey, Chancery Division, Morris County, and requests that further proceedings be conducted in this Court as appropriate. With the exception of the right to challenge service, Defendant does not waive and expressly reserves all rights and defenses available at law and equity, including but not limited to the right to move to compel arbitration.

DRINKER BIDDLE & REATH LLP

By:     /s/ Andrew B. Joseph
        Andrew B. Joseph
        *Attorneys for Defendant*

Dated: March 23, 2009

**1**

RECEIVED & FILED
SUPERIOR COURT
4:20
2009 MAR 20  AM 9:50

CIVIL DIVISION

**BRODERICK, NEWMARK & GRATHER**
A Professional Corporation
20 South Street, Suite 3
Morristown, NJ 07960
973-538-0084
Attorneys for Plaintiff

| | |
|---|---|
| EASTERN REGIONAL COMMUNICATIONS, INC., d/b/a MOJO WIRELESS | : SUPERIOR COURT OF NEW JERSEY<br>: MORRIS COUNTY-CHANCERY DIVISION<br>:<br>: Docket No: C-41-09 |
| Plaintiff, | :<br>: Civil Action |
| vs. | :<br>: VERIFIED COMPLAINT |
| AT&T MOBILITY, LLC | : |
| Defendant. | : |

EASTERN REGIONAL COMMUNICATIONS, INC., d/b/a MOJO WIRELESS, referred to hereafter as ERC, having its principal place of business at 106 S. State Street, Hackensack, New Jersey, by way of Complaint against the defendant, says:

Violation of the Franchise Act, N.J.S.A. 56:10-3

1.   Plaintiff is and was at all relevant times a corporation in good standing formed under the laws of the State of New Jersey having its principal place of business at 106 S. State Street, Hackensack, New Jersey.

2.   AT&T Mobility, LLC, referred to herein as AT&T, is a limited liability company, or other business entity, engaged in the providing of cell phone equipment and service in and about the

State of New Jersey with an office in New Jersey located at 340 Mt. Kemble Avenue, Morristown, New Jersey.

3.   On March 19, 2003 ERC entered into a Non-Exclusive Authorized Agency Agreement with Cingular Wireless II, LLC, referred to herein as Cingular.

4.   Pursuant to that Agreement ERC sold Cingular cell phone equipment and service on a non-exclusive basis through approximately two hundred (200) independent contractors operating stores in northern New Jersey and the New York metropolitan area.

5.   On March 19, 2006 Cingular unilaterally decided to change the relationship between the parties and insisted that ERC enter into a new Exclusive Dealer Agreement.

6.   The Exclusive Dealer Agreement was presented by Cingular to ERC in a "take it or leave it" fashion, with no opportunity for ERC to negotiate or vary the terms of the Agreement as presented by Cingular.

7.   On March 19, 2006 ERC signed the Exclusive Dealer Agreement with Cingular.

8.   Pursuant to the Exclusive Dealer Agreement ERC's stores were reduced in number to thirty (30) and were required, under the terms of the Agreement, to sell exclusively the equipment and service of Cingular and were expressly prohibited from selling the equipment and service of other cell phone providers.  A copy of the Agreement is attached hereto as Exhibit A.

2

9.   After March 18, 2006 Cingular assumed the name of AT&T and has traded under that name ever since.

10.  At all relevant times the parties contemplated that ERC would maintain a place of business in the State of New Jersey and ERC did maintain such a place of business.

11.  For the twelve months next preceding the institution of this suit, the gross sales of products or services between the Franchisor and Franchisee exceeded $35,000.00.

12.  More than twenty percent (20%) of ERC's gross sales were intended to be or were, in fact, derived from the contractual relationship with AT&T.

13.  The Agreement in Paragraph 9 grants to ERC a license to use the trademarks, service marks, trade names, logos, or similar markings of AT&T.

14.  There is a community of interest between AT&T and ERC in the marketing of goods and services.

15.  The Agreement is, therefore, controlled by the Franchise Act, N.J.S.A. 56:10-3.

16.  At the present time ERC operates twenty-seven (27) stores which employ approximately sixty-seven (67) people.

17.  At its Hackensack facility ERC operates a warehouse and office and employs nine (8) people.

18.  On March 18, 2009 AT&T sent to ERC a letter purporting to terminate the Agreement between the parties.  The letter did not

provide sixty (60) days' notice for the termination of the contract. ERC disputes the factual contentions in the letter. A copy of the letter is attached as Exhibit B.

19. In order to sell AT&T's equipment and service, each of ERC's stores has been issued a Dealer Code consisting of a letter and number combination.

20. By using the Dealer Code each store can access AT&T's facilities and thereby activate cell phones that they sell.

21. As of March 19, 2009 AT&T had unilaterally cancelled the Dealer Codes assigned to ERC's stores, thereby effectively putting them out of business.

22. Paragraph 11 of the Agreement provides that all disputes between the parties are subject to a Dispute Resolution Procedure.

23. ERC has demanded, pursuant to Paragraph 11.2 of the Agreement, that AT&T comply with the Dispute Resolution Procedure set forth in the Agreement. A copy of a letter demanding that AT&T follow the procedure is attached as Exhibit C.

24. As of the date of the Verification of this Complaint, AT&T has refused through counsel to follow the Dispute Resolution Procedure in the Agreement and the Dealer Codes remain cancelled.

25. ERC has in its warehouse about $103,000.00 worth of AT&T cell phones and equipment and the stores have about $125,000.00 worth of AT&T cell phones and equipment. Without functioning Dealer Codes these products are essentially valueless.

4

26. The unilateral cancellation by AT&T of the Dealer Codes has effectively put ERC and all of its stores out of business, will lead to the unemployment of approximately seventy-six (76) people and will jeopardize about twenty-seven (27) leases.

27. The failure of AT&T to provide sixty (60) days notice to the plaintiff before termination of the Agreement as required by the New Jersey Franchise Act, N.J.S.A. 56:10-3 et seq., or to follow the Dispute Resolution Procedure in the Agreement has caused, and continues to cause, the plaintiff irreparable damage justifying injunctive relief.

WHEREFORE, plaintiff demands judgment against defendant ordering defendant to reinstate the Dealer Codes immediately, to comply immediately with the Dispute Resolution Process contained in the contract, to provide sixty (60) days notice of an intent to terminate, awarding the plaintiff money damages, attorneys fees, interest and costs of suit.

BRODERICK, NEWMARK & GRATHER
Attorneys for Plaintiff


BY: ALAN J. BALDWIN

Dated: March 20, 2009

## CERTIFICATION

On information supplied by the plaintiff, the matter in controversy is not the subject of any other action pending in any

5

Court or of a pending arbitration proceeding nor is any such action or proceeding contemplated.   I know of no other party who should be joined in the within action.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

### NOTICE PURSUANT TO RULE 1:5-1A AND RULE 4:17-4C

This plaintiff hereby demands pursuant to the above cited Rules, that each party to this civil action who serves pleadings or interrogatories or receives answers thereto shall serve a copy of each such pleading, interrogatory and answer, including all documents, papers and other materials annexed thereto upon counsel for this plaintiff.   This is a continuing demand.

ALAN J. BALDWIN

Dated:   March 20, 2009

6

## VERIFICATION

I, Howard Back, am President of Eastern Regional Communications, Inc. I have read the allegations contained in the Verified Complaint. I certify that the allegations are true based on my own personal knowledge. I am aware that if any of the statements therein are willfully false I am subject to punishment.

HOWARD BACK

Dated: March 20, 2009

7



# CINGULAR WIRELESS
## EXCLUSIVE DEALER AGREEMENT

| Dealer | Cingular Wireless |
|---|---|
| Legal Name:  Eastern Regional Communications, Inc.<br>Business Name (if different):  Mojo Wireless<br>Type of Entity:  corporation ("Dealer") | Cingular Wireless II, LLC, on behalf of its affiliated companies operating in the Area ("Company") |
| **Dealer Address (For Official Notices)** | **Company Address (For Official Notices)** |
| Eastern Regional Communications, Inc.<br>106 S. State Street<br>Hackensack, NJ 07601<br>Attn: Howard Back | Cingular Wireless<br>5 Woodhollow Road<br>Parsippany, New Jersey 07054<br><br>Attn:    Vice President/General Manager |
| **Dealer Contact** | **Company Contact** |
| Name:  Howard Back<br>Title:  President<br>Telephone:  201-678-0200 | Name:  Kirk Bailey<br>Title:  Area Retail Sales Manager<br>Telephone:  516-581-0477 |
| **Dealer Billing Address** | |
| (same as above) | |

This Agreement consists of this Cover Page, the attached Terms and Conditions, **Schedule 1 (Area & Approved Retail Locations), Schedule 2 (Compensation Schedule)**, and all Dealer Policies issued in accordance with the Terms and Conditions (collectively, this **"Agreement"**).

*This Agreement is effective as of March 19, 2006, and continues in effect for a term of 2 years, unless earlier terminated in accordance with the provisions of this Agreement.*

DEALER'S SIGNATURE BELOW ACKNOWLEDGES THAT DEALER HAS READ AND UNDERSTANDS EACH OF THE PROVISIONS OF THIS AGREEMENT AND AGREES TO BE BOUND BY THEM.

| Eastern Regional Communications, Inc. | Cingular Wireless II, LLC, on behalf of its affiliated companies operating in the Area |
|---|---|
| By: _____<br>(Authorized Signature) | By: _____<br>(Authorized Signature) |
| Name: Albert Benjamin<br>Title:    Executive Vice President | Name:  Thomas DeVito<br>Title:    Vice President, General Manager |
| Date:   3-17-06 | Date:   03-21-06 |

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

## CINGULAR WIRELESS EXCLUSIVE DEALER AGREEMENT
### Terms and Conditions

1.   **DEFINITIONS.**

    **1.1**   **Affiliate**: Dealer's employees, officers, directors, consultants, owners' immediate family members, or any person, company, partnership or other entity that directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with Dealer, Dealer's employees, officers, directors, or owners' immediate family members.

    **1.2**   **Competitive Service**: Any wireless communications service offered by any person, entity, or business (other than Company) in the Area that is capable of providing wireless voice or data service that is functionally similar or equivalent to Company's Service, irrespective of the radio frequency on which the service is offered, including, without limitation: commercial mobile radio service, specialized mobile radio communications, mobile satellite communications, cellular service, personal communications services, Wi-Fi, Wi-Max, one and two-way paging services, and services on similar frequencies or technologies; and any service that competes with any other service that Company offers under this Agreement.

    **1.3**   **Equipment**:   Wireless devices necessary for using Service that meet FCC and Company technical standards, that comply with all fraud prevention specifications required by Company, and that are certified by Company for use on its Service.

    **1.4**   **Service:**   All voice and data wireless services that Company provides within the Area, whether or not Dealer is authorized to sell these services.

    **1.5**   **Subscriber**:   A customer of Service, including without limitation all end-users of Service, or an applicant to Service.

2.   **RELATIONSHIP OF THE PARTIES.**

    **2.1**   **Area.**  Company has received regulatory authority to operate as a facilities-based provider of Service within the Area.  The Area is defined as the one or more Company operating markets that are listed on the attached **Schedule 1 – Area & Approved Retail Locations.** If Dealer is authorized to operate in more than one market, an additional Schedule 1 will correspond to each additional market.  Company's authorization to add a market to the Area listed on Schedule 1 must be in writing and signed by Company. Each Company market may have a different Compensation Schedule and different Dealer Policies from those of other markets operating under this Agreement.  Company may terminate Dealer's authorization to operate in any individual market due to a breach of this Agreement or as otherwise specified in this Agreement.

    **2.2**   **Authorization from Approved Retail Locations.**  Company authorizes Dealer to offer and sell Service -- excluding Service that Company has defined as non-authorized Service -- only from **Approved Retail Locations,** which are Dealer's retail locations within the Area that have been approved by Company in writing under this Agreement.  The Approved Retail Locations are listed on Schedule 1, which Company may issue from time to time to update the list of Approved Retail Locations within an existing market.

    **2.3**   **Nature of Relationship.**  The relationship created by this Agreement is that of independent contracting parties and is not any other relationship, including, without limitation, that

of joint employers, a joint venture, or a partnership. Personnel employed by, or acting under the authority of a party to this Agreement are not employees or agents of the other party. Company and Dealer assume sole responsibility for the employment, compensation, discharge, and control of their own respective employees, contractors, and agents, and for ensuring their compliance with this Agreement. Dealer is not a general agent of Company. Dealer has not paid and is not required to pay any franchise fee or other fee to be a dealer for Company or to use Company's name or other intellectual property. This Agreement does not create any franchise between the parties. Neither Dealer nor any Affiliate may be a reseller of Company's Service.

### 2.4    Prohibitions and Restrictions.

2.4.1    Dealer is prohibited from conducting any telemarketing, direct marketing, or electronic commerce effort to solicit Subscribers from the general public. Any exceptions to this restriction must be made in writing and signed by Company. Further details regarding this restriction and any limited exceptions may be contained in the Dealer Policies related to direct marketing and electronic commerce.

2.4.2    Company reserves the right to declare selected Service as non-authorized Service by restricting Dealer from selling Service: (a) on certain non-authorized service rate plans (voice or data); (b) on certain types of technologies; (c) on certain models of Equipment; (d) to certain specifically enumerated Subscribers; (e) to certain classes of Subscribers, such as those that generate revenues above a specific level, or governmental or corporate entities; and (f) by certain sales or marketing methods. All applicable restrictions are defined in the Dealer Policies or may be communicated to Dealer in writing from time to time.

2.4.3    Dealer is prohibited from having subdealers under this Agreement. Dealer must not, directly or indirectly, share any compensation earned under this Agreement with any other person or entity that sells Service to the public, except for Dealer's own employees or contracted sales representatives. Dealer must not allow any other person or entity to use its dealer codes issued by Company under this Agreement. Any exceptions to these prohibitions must be under a separate written amendment between the parties.

### 2.5    Other Competitive Distributors.  Company currently sells Service and equipment directly to potential Subscribers and has also appointed other dealers, retailers, resellers, and others to sell Company's Service in the Area in direct competition with Dealer. Company reserves the right to continue these direct and indirect distribution practices in the future at any location within the Area regardless of the proximity to any Approved Retail Location. Company and others may also sell other products and services and provide installation, repair, or warranty service in the Area. In addition, Company may enter into agreements with other exclusive or nonexclusive distributors that contain compensation and terms and conditions that are different than the compensation and terms and conditions in this Agreement, and that permit these competitive distributors to offer products and services in the Area that are different than the products and Services that Dealer is authorized to distribute under this Agreement. Company, in its sole discretion, determines which products and services that Dealer is authorized to distribute under this Agreement and Company is not obligated to authorize Dealer to distribute any of the products or services offered by the competitive distributors.

### 2.6    Acknowledgments and Representations.

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

exclu dlr - v.1, 7/1/05

**2.6.1** Company and Dealer understand and accept that the terms, conditions, and covenants contained in this Agreement are reasonably necessary to maintain Company's high standards for Service and to protect and preserve the goodwill of Company's Service and its brand. Dealer has made material representations to Company in its application to become an authorized dealer of Company and Company has relied upon these representations as a material inducement to enter into this Agreement.

**2.6.2** Dealer represents and warrants to Company that the execution and performance of this Agreement does not violate any other contract or obligation to which Dealer is a party, including terms relating to covenants not to compete, exclusive dealing, and confidentiality covenants. Dealer must not disclose to Company, or use or induce Company to use, any proprietary information or trade secrets of any other person, association, or entity.

**2.6.3** Company expressly disclaims the making of, and Dealer acknowledges that it and its Affiliates have not received, have no knowledge of, and are not relying on any representation by any employee or representative of Company or its affiliates as to: (i) the revenue or profitability that Dealer might achieve as a result of entering into this Agreement; (ii) the number of activations, upgrades, or other business activity that Dealer may facilitate as a result of entering into this Agreement; (iii) the quality of the network from which Services are provided; and (iv) any other factor relating to the business operations of Dealer, except as expressly set forth in this Agreement. Dealer represents that it has independently investigated the risks and opportunities of the business outlined in this Agreement and has independently decided to sign this Agreement. Dealer acknowledges that it is responsible for independently deciding on the location of each Approved Retail Location and Company is not responsible for Dealer's decision to open any Approved Retail Location.

3.     APPROVED RETAIL LOCATIONS.

**3.1     Opening an Approved Retail Location.** When Dealer is opening its initial Approved Retail Location(s), and if Dealer desires to open any additional location, Dealer must first receive written approval from Company. Dealer is solely responsible for selecting any potential location, but Company may approve or deny any location at its sole discretion. The lease for any location that Company approves must be in Dealer's own name. Company must be named in each lease as a preapproved assignee of that lease. Dealer expressly acknowledges that it does not have the authority to bind Company or its affiliates to any lease agreements. Upon request by Company, Dealer must submit any proposed lease to Company for its approval before Dealer signs the lease. Dealer must promptly notify Company of the date a new location opens so that Company may issue a revised Schedule 1. Any retail location approved by Company under this Agreement that Dealer opens in the Area constitutes an Approved Retail Location subject to the terms and conditions of this Agreement, whether or not the change is actually reflected on Schedule 1.

**3.2     Selling or Closing a Leased Approved Retail Location.**

**3.2.1     If Dealer wants to terminate, transfer, sell, or otherwise dispose of its leasehold interest in an Approved Retail Location, Dealer must provide Company with 90 days advance written notice setting forth the reasons for the closure, transfer, sale, or disposal, and with a copy of the relevant lease. Company has 45 days from the date it receives this notice to decide to either assume or reject the remainder of each lease. If Company decides to assume a lease, Dealer must assign the lease, together with all leasehold improvements to this Approved Retail

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Location, to Company without any additional consideration. However, Company will reimburse Dealer for the depreciated value of any direct out-of-pocket expenses that Dealer incurred for the purchase of any equipment, furniture, or fixtures that were required by Company and for which Dealer was not previously reimbursed. Company has no obligation to reimburse Dealer for any expenditures that were not required by Company. Dealer remains responsible for all of its obligations under the lease through the effective date of the assignment. If Company decides not to assume any lease, Dealer must notify Company as soon as the Approved Retail Location actually closes or is transferred so that Company may issue a revised Schedule 1. If Dealer closes down or stops selling Service from any Approved Retail Location, that location automatically loses its approval and is no longer an Approved Retail Location, whether or not Dealer complied with this Agreement regarding that closure or transfer and whether or not the change is actually reflected on Schedule 1.

**3.2.2** Failure to provide Company with the required advance written notice may result in the unnecessary closure of an Approved Retail Location, which would cause the Company to suffer monetary damages and damages to its reputation and goodwill. These damages would be difficult to quantify and measure. As a result, Dealer must pay Company $50,000 as liquidated damages for each Approved Retail Location that is closed without providing the required advance written notice. Acceptance by Company of liquidated damages under this provision does not limit Company's right to seek any other appropriate remedies under this Agreement, including without limitation termination of this Agreement.

**3.3** **Termination of Agreement.** If Dealer elects to terminate this Agreement without cause, or to not renew this Agreement at the end of any term, then Company has the option in its sole discretion, to require Dealer to assign to Company the leases together with all leasehold improvements for those Approved Retail Locations that Company selects without any additional consideration. However, Company will reimburse Dealer for the depreciated value of any direct out-of-pocket expenses that Dealer incurred for the purchase of any equipment, furniture, or fixtures that were required by Company and for which Dealer was not previously reimbursed. Company has no obligation to reimburse Dealer for any expenditures that were not required by Company. Dealer remains responsible for all of its obligations under all leases through the effective date of the assignment.

**3.4** **Right of First Refusal for Dealer-Owned Approved Retail Locations.** If Dealer owns one or more Approved Retail Location and if at any time during the term of this Agreement or upon termination of this Agreement, Dealer receives a bona fide offer from a third party to lease any or all of these Approved Retail Locations (whether directly or indirectly), and Dealer desires to accept this offer, Dealer must notify Company in writing of the terms of this offer. Dealer must provide Company 60 days in which to exercise Company's right of first refusal from the date Company receives notice of the pending lease. If Company elects to exercise this right related to leasing Dealer's Approved Retail Locations, then Company will deliver a written notice to Dealer representing Company's desire to lease these Approved Retail Locations at the same price that is offered to Dealer by the third-party.

**3.5** **Dealer Cooperation.** If Company elects assignment or purchase of any Approved Retail Location, then Dealer must cooperate with Company to provide and sign all appropriate documents requested by Company to facilitate the transaction. Dealer must convey all right, title, and interest to Company in all furniture, fixtures, improvements, and other personal property located in the assigned Approved Retail Locations. Dealer must also cooperate with Company if the landlord or other third party requires additional steps to facilitate the transaction.

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

4.      **DEALER'S RESPONSIBILITIES.**

**4.1     General.** Dealer must devote sufficient resources and use commercially reasonable efforts to promote and sell the Service authorized by Company at all times while this Agreement is in effect. Dealer must not take any action inconsistent with this Agreement and must support Company's efforts in providing Service to Subscribers. Dealer must provide timely, courteous, and efficient service to Subscribers and must be governed in all dealings with members of the public by the highest standards of honesty, integrity, ethical conduct, and fair dealing. Dealer must not engage in any business practice, promotion, or advertising that may be harmful to Company's business or goodwill.

**4.2     Confidentiality.**

**4.2.1** Dealer may receive certain confidential or proprietary information relating to Company or its affiliates, including without limitation, lists of Subscribers, Subscriber information, Customer Proprietary Network Information "CPNI" as defined in the Telecommunications Act (47 U.S.C § 222), technical, financial, and business information, including without limitation, compensation information, the terms of this Agreement, computer programs, data, specifications, and other information not generally known to the public relating to Company (collectively, "Confidential Information"). Any Confidential Information disclosed to Dealer has been disclosed solely for the performance of its duties under this Agreement, and any improper use or disclosure would irreparably injure Company. All Confidential Information is Company's trade secret and exclusive property, and must be returned to Company upon request or upon the termination of this Agreement.

**4.2.2** During and after the term of this Agreement, Dealer must not directly or indirectly, divulge, sell, give away, or transfer any Confidential Information. Dealer may only use Confidential Information for the performance of its duties under this Agreement and Dealer must comply with further restrictions related to Subscribers' Confidential Information and Subscriber privacy as set forth in the Dealer Policies. Dealer may only provide its Affiliates with the specific Confidential Information that they require for the performance of Dealer's duties under this Agreement. Dealer must advise these individuals of the non-disclosure restrictions, and make reasonable efforts to prevent the improper disclosure or use of Confidential Information, including without limitation, having any Affiliates who are not employees agree in writing not to disclose any Confidential Information. If Dealer is served with any form of legal process to obtain Confidential Information, it must immediately notify Company, which has the right to seek to quash this process.

**4.3     Access to Company Systems.** If Company, in its sole discretion, provides Dealer access to any of Company's systems for purposes of performing Dealer's duties under this Agreement, Dealer must use this access only for the purpose authorized explicitly in writing by Company. If Company provides any equipment or software for this purpose, the equipment and software are the sole property of Company at all times, and any software may be subject to a separate license agreement.

**4.4     Non-Solicitation.** While this Agreement is in effect and for one year after it is terminated, Dealer and its Affiliates must not contact Company's Subscribers for the purpose of soliciting or giving any incentive to those Subscribers to terminate their agreement with Company or to convert to a Competitive Service within the Area. During the one-year period after this

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Agreement is terminated, any Subscribers who contact Dealer regarding any aspect of Company's Service must be referred directly to Company.

**4.5    Solicitation and Enrollment.**   Dealer must solicit Subscribers strictly in accordance with the Dealer Policies for enrollment of Subscribers and must provide adequate training for its salespersons. Company has the sole right to accept or reject all customer applications for Service. Dealer must market Service that Dealer is authorized to sell to potential Subscribers at rates and on terms and conditions established and published solely by Company, as revised by Company from time to time. Dealer has no right or authority to offer any other service plans, or to vary in any way, rates, rate plans, terms, or conditions related to Service. Dealer must comply with any Dealer Policies regarding security deposits for Service.

**4.6    Subscriber is Company's Customer.**    Once activated, the Subscriber is a customer of Company, and Company is solely responsible for providing billing services to Subscribers. Company may also directly market to and solicit Subscribers as it determines to be in its best interest, without obligation or liability to Dealer. Dealer must not interfere with the contractual relationship between Company and Subscriber in any way. Dealer is not permitted to: a) bill or collect any money from a Subscriber or potential Subscriber for Service, except for prepaid Service and security deposits; b) take any financial responsibility for a Subscriber's Service charges; or c) suggest or facilitate any arrangement to improperly decrease a Subscriber's financial obligation under its Service agreement.

**4.7    Fraudulent Activity.**   Dealer must assist Company's efforts to prevent fraudulent or abusive subscription to or use of Company's Service and must comply with all fraud prevention Dealer Policies. Dealer must not process any application for Service or facilitate Service enrollment that would in any way improperly or fraudulently inflate the number of Subscribers for which it receives compensation or the amount of compensation payable to Dealer for a Subscriber. If Company determines that Dealer has performed any Subscriber activations in a fraudulent, deceitful, or misleading manner, then Dealer is not entitled to compensation under this Agreement for those activations and Dealer is required to compensate Company for losses caused by Dealer's actions in violation of this section or of the related Dealer Policies.

**4.8    Dealer's Business Records.**   Dealer must create and maintain at its principal office, and preserve for at least 4 years from the date of their preparation, complete and accurate records of its business conducted under this Agreement. These records must include, without limitation, records of all activations of Subscribers, compensation earned, advertising, Subscriber solicitations, equipment sales, and Subscriber complaints. Copies of these records must be provided to Company by Dealer upon reasonable advance notice. Dealer must comply with all requirements for the destruction of business records imposed by law, in addition to all Company requirements that are set forth in the Dealer Policies. Upon reasonable advance notice, Dealer must allow Company or its representative access to Dealer's facilities and Approved Retail Locations during normal business hours for inspection of these locations and of these business records and to verify compliance with Company's document destruction policy.

**4.9    Minimum Performance Requirements.**   Company may require Dealer to achieve minimum performance requirements related to Dealer's Subscriber activations, Subscriber churn, and average revenue per Subscriber within an individual market or within the Area, as set forth in the Dealer Policies. Company may add additional minimum performance requirements, or modify existing minimum performance requirements in any way with 30 days advance written notice to Dealer. Dealer's failure to achieve the applicable minimum performance requirements in any

individual market or in the Area may result in termination of Dealer's authorization to operate in any individual market or in termination of this Agreement, or in making Dealer ineligible for certain compensation, as set forth in the Dealer Policies.

**4.10    Insurance.**  Dealer must maintain sufficient workers' compensation insurance and commercial general liability insurance for claims arising out of or occurring in connection with this Agreement, including but not limited to the acts, omissions, or representations of Dealer and its officers, employees, and representatives. This insurance coverage must be maintained at all times during the term of this Agreement at Dealer's sole expense. Company must be named as an additional insured on each commercial general liability policy. This insurance coverage must be maintained under one or more policies from an insurance company qualified to do business within the Area, with an A.M. Best rating of at least A-, providing minimum liability protection of $1 million per occurrence for bodily and personal injury and death and $1 million per occurrence for property damage. Dealer must provide Company with a certificate of insurance verifying compliance with the provisions of this paragraph upon request.

**4.11    Regulatory Matters.**  This Agreement is subject to changes necessary to comply with the laws, orders, or regulations of local, state, and federal regulatory agencies with jurisdiction over Service in the Area or over Dealer's activities. Company may take any action it determines is reasonably necessary to comply with these laws, orders, and regulations. Dealer must not take any action inconsistent with Company's efforts, and must cooperate with Company before any regulatory authorities.

**4.12    Compliance with Laws.**    Dealer must comply with all local, state, and federal laws and regulations applicable to Dealer's business under this Agreement. Dealer must not discriminate against any Subscriber, employee, or applicant for Service because of race, color, religion, age, sex, national origin, or physical handicap during the performance of this Agreement, and must comply with all applicable nondiscrimination laws.

**4.13    Exclusivity.**

**4.13.1**  Within the Area, Dealer and its Affiliates must not, directly or indirectly: (a) solicit, sell, offer, or accept offers for a Competitive Service; (b) induce or refer any actual or prospective Subscriber of Service to subscribe to a Competitive Service; (c) provide any leads to a distributor of Competitive Service; (d) activate subscribers through a reseller or act as a reseller, whether for Company or a Competitive Service; (e) lease, sub-lease, or otherwise provide space to any distributor of Competitive Service; or (f) share financial resources, retail space, administrative support, sales support, managerial support, or any other business resources with any distributor of Competitive Service.

**4.13.2**  If, as a result of a violation of this exclusivity provision of this Agreement, Dealer or any Affiliate activates a customer on Competitive Service, Company will suffer monetary damages and loss of goodwill, the value of which is difficult to measure. As a result, Dealer must pay Company $1500 as liquidated damages for each end-user customer that Dealer or its Affiliate activates on Competitive Service, which sum Dealer agrees is reasonable. Dealer must, upon Company's written notice, make its books and records available to Company to permit verification of Dealer's compliance with this provision. In the event of Dealer's refusal to permit this inspection, Dealer must pay Company $1500 as liquidated damages for each end-user customer that Dealer or its Affiliate activates on Competitive Service, as determined by Company. Acceptance by Company of liquidated damages under this provision does not limit Company's

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

right to seek any other appropriate remedies under this Agreement, including without limitation termination of this Agreement.

5. **COMPANY'S RESPONSIBILITIES.**

**5.1 Service.** Company will provide Service to Subscribers subject to regulatory and legal approvals, and based on Company's own guidelines and standards for the provision of Service, which Company may change from time to time at its sole discretion.

**5.2 Training.** Company will make sufficient training available to Dealer for it to properly offer and sell products and services under this Agreement, in Company's sole discretion.

**5.3 Marketing Support.** Company will promote and advertise its Service and provide promotional literature from time to time as Company considers appropriate.

**5.4 Compliance with Laws.** Company will comply with all local, state, and federal laws applicable to Company's business under this Agreement.

**5.5 Reporting.** Company will provide information and reporting related to Dealer's business conducted under this Agreement as Company considers appropriate based on Company's systems and capabilities.

6. **COMPENSATION.**

**6.1 Compensation Schedule.** Subject to the terms and conditions of this Agreement, Dealer will earn from Company the compensation set forth in the attached **Schedule 2 – Compensation Schedule.** The Compensation Schedule specifies the complete amount owed to Dealer for Dealer's performance of services and its compliance with obligations under this Agreement.

**6.2 Modifications.** Company may modify the terms and conditions or the payment amounts of every type of compensation listed in the Compensation Schedule in any way with at least 30 days advance written notice to Dealer, including without limitation any Subscriber Management Fees that may be offered in the Compensation Schedule. Company may, without advance notice to Dealer, stop offering any Service plans, or may introduce new or revised Service plans and new services with different compensation than what is set forth in the Compensation Schedule.

**6.3 Offset/Recoupment.** Company or its affiliates may, at any time, offset and recoup against any and all amounts owed to Dealer or its Affiliates any amounts owed by Dealer or its Affiliates to Company, including but not limited to amounts owed or to be owed under this Agreement, or any other agreement, and any costs or damages incurred by Company and indemnified by Dealer.

**6.4 Compensation Net of Chargebacks.** All compensation earned by Dealer under this Agreement for a Subscriber must be paid back to Company if the Subscriber deactivates from Service or other changes to Service occur that constitute a Chargeback as defined in the Compensation Schedule. The time period in which a Chargeback applies is called the Chargeback Period, which is also defined in the Compensation Schedule. Any compensation

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

generated by Dealer under this Agreement is not owed by Company to Dealer until after Dealer's Chargebacks have been deducted.

## 7.    EQUIPMENT.

**7.1    Certified Equipment.**  Dealer may only sell or lease to Subscribers models of Equipment and SIMs that are fully compatible with Company's Service and that are certified by Company. Dealer must not recommend, sell, or furnish any equipment or accessories disapproved by Company or the FCC for any reason, including without limitation for failure to meet reasonable technical, security, or reliability standards.  Equipment sold by Company meets all standards required under this Agreement.  Company may require or prohibit the use of certain Equipment with selected rate plans or in certain geographic areas, at Company's sole discretion.

**7.2    Credit Approval/Limitations on Equipment Sales.**  Dealer must apply for credit approval in order to purchase Equipment from Company other than on a cash delivery basis, and may be required to sign security agreements, financing statements, and related documents in seeking credit approval. Company may accept or reject Dealer's credit application and may reevaluate Dealer's credit status and limit or eliminate Dealer's credit purchases at Company's sole discretion at any time.  Company may not sell Equipment to Dealer at certain times for various reasons, including, but not limited to, exhaustion of Equipment supplies, manufacturing shortages, supply disruptions, legal prohibitions, or technological obsolescence.

**7.3    Dealer Purchase of Equipment.**

**7.3.1**  All Equipment sold by Company to Dealer is sold at prices established by Company from time to time and under the terms and conditions of this Agreement.  Company reserves the right to only make certain models of Equipment available for purchase by Dealer.  All purchases must be made by Dealer in the form of a written purchase order that must be placed with Company, subject to acceptance by Company.  The terms and conditions appearing on the purchase order form and made a part of this Agreement are limited to the following information, which is necessary to assure prompt processing:  (a) Company's invoice number; (b) delivery information; (c) Company's shipping charges (if applicable); (d) description; (e) quantity (within applicable limits); (f) applicable sales tax; (g) Company's price of each item and final total cost; and (h) signed purchase authorization.  Any additional terms or terms inconsistent with this Agreement contained in the purchase order are deleted and are of no effect.

**7.3.2**  Delivery of Equipment is made to Dealer's designated delivery point.  Company may charge delivery costs at its discretion to cover its expenses.  Title and risk of loss of Equipment pass to Dealer when the Equipment is shipped from the dock of either Company or its supplier.

**7.3.3**  Payment for Equipment sold on credit to Dealer is due 30 days from the date of invoice.  Dealer must pay the full invoiced amount without deductions.  If Company agrees that any disputed invoice is incorrect, Company will submit another invoice for the corrected amount.

**7.3.4**   If any amount payable by Dealer to Company becomes past due, in addition to other remedies for breach including but not limited to the immediate termination of this Agreement, Company may elect one or more of the following: (a) require Dealer to pay its account in full; (b) exercise Company's right of offset to collect any money owed by Dealer; (c) require Dealer to deposit with Company an irrevocable commercial letter of credit, cash, or other form of

security, in form and content acceptable to Company; or (d) require Dealer to pay interest charges of 1.5 percent per month, or the maximum rate allowed by law, whichever is lower, on the outstanding balance due.

**7.4    Manufacturer's Warranty.** Dealer must make the manufacturer's limited warranty statement for Equipment readily available to its customers at the time of sale. Dealer must not make any warranty representations that are in addition to the statements in the manufacturer's limited warranty.

**7.5    Disclaimer of Warranty by Company.** Except for the warranty of title, which is provided by Company with Equipment purchased under this Agreement, COMPANY MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY EQUIPMENT. COMPANY SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER WARRANTY OF FITNESS OR QUALITY.

**7.6    Limitation of Liability for Equipment.** COMPANY IS NOT LIABLE TO DEALER FOR LOST PROFITS OR REVENUES, WHETHER PRESENT OR PROSPECTIVE, FOR LOSS OF TIME OR BUSINESS REPUTATION, INCONVENIENCE, LOSS OF USE OF ANY EQUIPMENT, PROPERTY DAMAGE, OR FOR ANY OTHER INDIRECT, SPECIAL, RELIANCE, INCIDENTAL, OR CONSEQUENTIAL LOSS OR DAMAGE CAUSED BY ANY EQUIPMENT OR ITS FAILURE TO WORK. THESE LIMITATIONS OF LIABILITY APPLY TO ALL CAUSES OF ACTION IN ANY WAY RELATED TO THE EQUIPMENT, INCLUDING, WITHOUT LIMITATION, ALLEGED BREACH OF WARRANTY, BREACH OF CONTRACT, PATENT OR COPYRIGHT INFRINGEMENT, OR TORT, WHETHER IN NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LOSSES OR DAMAGES. IN THE EVENT OF ANY LIABILITY OF COMPANY TO DEALER RELATED TO EQUIPMENT SOLD UNDER THIS AGREEMENT, THIS LIABILITY IS LIMITED TO THE LESSER OF (a) DEALER'S PROVEN DIRECT DAMAGES, OR (b) THE PURCHASE PRICE OF THE EQUIPMENT WITH RESPECT TO WHICH THE ALLEGED LOSSES OR DAMAGES ARE CLAIMED.

**7.7    Transshipment.** Dealer must sell Equipment and SIMs purchased from Company or bearing Company's Marks to individuals or businesses that it reasonably believes are the actual end users of this Equipment for activation to Service within the Area. Dealer must not sell or ship these SIMs or Equipment to any location outside of the Area, directly or indirectly. Dealer must comply with all Dealer Policies regarding transshipment and inactivated Equipment levels. If Company determines that Dealer has engaged in transshipment, this Agreement may be terminated immediately and Dealer must pay for losses suffered by Company.

**7.8    Equipment Pricing/Returns.** All prices for sale of Equipment and accessories by Dealer to Subscribers must be established solely by Dealer. Dealer must abide by Company's Equipment return policies relative to Subscribers and to Dealer, as set forth in the Dealer Policies.

**8.    DEALER POLICIES.**

**8.1    Compliance with Dealer Policies.** Dealer must comply with all policies governing the conduct of Dealer's business under this Agreement reasonably prescribed from time to time by Company. All policies issued by Company under this Agreement are incorporated by reference in this Agreement in their entirety ("Dealer Policies"). Dealer's failure to comply with these Dealer Policies constitutes a material breach of this Agreement and may subject Dealer to monetary

penalties that are specifically outlined in the Dealer Policies, forfeiture of Dealer's right to sell certain products or services, termination of this Agreement, or other remedies identified in the Dealer Policies. Company will send written notice to Dealer of any new Dealer Policies issued by Company or of any changes to existing Dealer Policies. In addition, Dealer must comply with other operational manuals, procedural guides, or information statements that Company may issue from time to time.

**8.2    Distribution of Other Products and Services.** Company may, in its sole discretion, offer Dealer the opportunity to distribute other products and services under the terms and conditions of this Agreement through a Dealer Policy. If Dealer chooses to participate in distributing other products and services, it must comply with any additional terms and conditions set forth in the relevant Dealer Policies.

## 9.    USE AND PROTECTION OF MARKS.

**9.1    Use of Marks.** During the term of this Agreement, Company authorizes Dealer to be an Authorized Dealer of Company and to use its trademarks, service marks, trade names, logos, or similar markings that Company owns or is licensed to use ("Marks") subject to the limitations contained in this Agreement, including the Dealer Policies. Company will publish a list of authorized Marks that Dealer is licensed to use on a nonexclusive basis and the words identifying or qualifying Dealer's relationship to Company, all of which Company may change from time to time. Dealer must indicate that Company is the provider of the Service in its advertising, and may use the authorized Marks in its advertising. Dealer must not use the Marks for any other purpose without the express prior written consent of Company.

**9.2    No Transfer of Rights.** This Agreement does not transfer any rights to use any Marks (except to the limited extent expressly set forth in this Agreement) and does not confer any goodwill or other interest in the Marks. All Marks and the great value of the associated goodwill are the exclusive property of Company. All displays, banners, signs, and other similar tangible property bearing Company's name or Marks are the sole property of Company. Dealer must not challenge Company's ownership of the Marks in any way. Company transfers no rights and grants no licenses, express or implied, under any patents or other intellectual property owned or licensed by Company.

**9.3    Unauthorized Use.** Any unauthorized use of the Marks by Dealer or its Affiliates or agents constitutes infringement of Company's rights and a material breach of this Agreement. Upon demand by Company or upon termination of this Agreement for any reason, Dealer must immediately discontinue use of all Marks. In this event, Dealer must promptly return all signage and other materials bearing Company's name, or allow Company to enter Dealer's premises to remove these materials upon 5 business days advance notice. If landlord or governmental approval is required to remove any signage, Dealer must take reasonable action to assist Company's efforts to obtain these approvals. Dealer must cooperate with Company's efforts to protect its Marks and other intellectual property.

**9.4    Advertising.** Dealer is under no obligation to conduct any type of advertising. If Dealer chooses to advertise, however, Dealer must conform to the highest ethical standards for advertising, take all reasonable steps to make sure that its advertising materials are factually correct, comply with all applicable laws, and correctly use the Marks. Company may require that Dealer's marketing and advertising materials be submitted to Company for review before being used, as set forth in the Dealer Policies.

## 10.   TERM AND TERMINATION.

**10.1   Term.** This Agreement will terminate after the 2 year term stated on the Cover Page of this Agreement. This Agreement can only be renewed by a separate written agreement signed by both parties.

**10.2   Termination for Cause with Cure Period.** Subject to the provisions contained in section 10.3, either party may terminate this Agreement by written notice to the other party if the other party breaches any material provision of this Agreement. In the event of a breach, the allegedly breaching party must be provided with written notice of any violation of this Agreement and offered 30 days to cure this violation after receiving this notice. If the breach is not cured by the end of the 30-day period, then any previously delivered termination notice becomes effective without further notice.

**10.3   Termination for Cause Immediately Upon Written Notice.** Despite the above, a breach by Dealer of any part of sections 2.6.2, 3.2, 4.1, 4.2, 4.3, 4.4, 4.7, or 9 of this Agreement is not subject to cure and, accordingly, any such breach gives Company the right to terminate this Agreement immediately upon written notice to Dealer. Either party may also terminate this Agreement immediately upon written notice to the other party if the FCC or any other regulatory agency promulgates any regulation or order that prohibits or substantially impedes either party from fulfilling its obligations, or if the other party: (a) becomes financially insolvent; (b) makes an assignment for the benefit of creditors; (c) has an Order for Relief under the United States Bankruptcy Code entered by any federal court against it; or (d) has a trustee or receiver of any substantial part of its assets appointed by any court. Company may terminate this Agreement immediately upon written notice if for any reason Company is no longer authorized to provide Service within the Area, if Dealer is found to have made a material misrepresentation or omission to Company during the application process, or if Dealer is found to have engaged in fraudulent or illegal conduct that either harms Company or that is likely in Company's sole discretion to adversely affect Company's reputation or goodwill.

**10.4   Termination Without Cause.** Either party may terminate this Agreement in its entirety, without cause, with 90 days prior written notice to the other party. Either party may also terminate this Agreement with respect to any individual market or markets listed on Schedule 1, without cause, with 90 days prior written notice to the other party.

**10.5   Termination Reserve/Payment of Chargebacks.** Upon any notice of termination of this Agreement, or notice of termination of Dealer's authorization to operate in any market, or if Company determines in its sole discretion that Dealer is likely to stop doing business in any market, Company may withhold a reserve from any money owed to Dealer that may be used to satisfy any obligations owed or to be owed by Dealer to Company, including but not limited to, anticipated Chargebacks after the termination of this Agreement or after Dealer stops doing business. Accordingly, Company may hold a reserve in the amount of the approximate value of Dealer's Chargebacks over the previous 180 days, adjusted for the amount Company expects Dealer to owe, in Company's sole discretion. Any remaining balance in the reserve 180 days after the termination date will be promptly paid to Dealer. Despite any reserve, if Dealer still owes Company money for Dealer's post-termination Chargebacks, then Dealer must pay the remaining balance of the Chargebacks to Company within 30 days of written request.

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

**10.6   Obligations of Dealer Upon Termination.** Upon the termination of this Agreement, Dealer must: (a) discontinue the use of all Marks, and any similar trade names, service marks, trademarks, signs, or designs, and must return to Company all materials containing any Mark or otherwise identifying or relating to Company's business; (b) cease representing itself in any fashion as a Dealer or representative of Company; (c) return to Company or destroy those documents, records, or other materials (including all copies, either photocopies or electronic copies) that were provided to Dealer by Company or that contain any Confidential Information, including without limitation all information related to Subscribers and all CPNI; and (d) not solicit Subscribers for one year in accordance with the non-solicitation provision of this Agreement.

**10.7   No Compensation.** Upon termination of this Agreement, Dealer's right to all forms of compensation under this Agreement ends, including without limitation any Subscriber Management Fees. Similarly, upon termination of Dealer's authorization to operate in any individual market, Dealer's right to all compensation under this Agreement related to that market ends, including without limitation any Subscriber Management Fees. However, if under the relevant Compensation Schedule, Dealer is eligible for commission for a Subscriber activation before the termination date of this Agreement and that Subscriber remains active through the relevant Chargeback Period after the termination of the Agreement, then Dealer earns its one-time commission for that Subscriber.

## 11.   DISPUTES.

**11.1   Notification and Limitation of Actions.** Dealer must notify Company in writing of any controversy or claim it may have regarding this Agreement or its relationship with Company within 120 days of the date Dealer became aware or should have become aware of this grievance or dispute. If Dealer fails to notify Company of the controversy or claim within 120 days, then Company is not liable to Dealer for any loss or injury relating to that controversy or claim. The failure by Dealer to timely notify Company of any grievance or dispute is an absolute bar to the institution of any proceedings that may have been based upon this grievance or dispute.

**11.2 Mandatory Pre-arbitration Dispute Resolution Procedures.** If a controversy or claim arises out of or related to this Agreement, the dispute resolution procedures in this section are required before either party may initiate arbitration. Either party must request to meet the other party within 14 days, at a mutually agreed time. A representative of Dealer and of Company who are empowered to resolve the matter will meet at least once and will attempt in good faith to resolve the matter. If the matter has not been resolved within 21 days of their first meeting, the matter then becomes the responsibility of a senior executive of each party who has authority to settle the dispute. The parties must promptly prepare and exchange memoranda stating all of the disputed issues and their positions on these issues, an estimate of the amount of direct losses suffered and of the amount of damages claimed, a summary of the negotiations that have taken place, and attaching relevant documents. A senior executive of Company and Dealer will meet for negotiations within 14 days after the end of the 21-day period referred to above at a mutually agreed time. The first meeting of senior executives should be held at the offices of the party receiving the request to meet, and future meetings will rotate between the offices of Dealer and Company.

### 11.3   Arbitration of Disputes.

**11.3.1 Arbitration Clause.** If the matter has not been resolved under the mandatory dispute resolution procedures above, then, except as stated in section 11.3.4 of this Agreement, all claims (including counterclaims and cross-claims and also including claims based

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

on tort or other legal theories) and disputes between Dealer and Company must be resolved by submission to binding arbitration. The parties understand that they are waiving all right to a jury trial, even if this arbitration clause is found to be inapplicable or invalid, in which case a judge must decide the dispute. The parties must submit any disputes to the American Arbitration Association ("AAA") nearest to Dealer within the Area to be decided under the then current AAA commercial arbitration rules, as modified by this Agreement. In the event that AAA declines to administer this arbitration, the parties will then mutually agree upon another qualified arbitration institution. The arbitration must be conducted by 3 arbitrators. The nature and outcome of any arbitration under this Agreement is Confidential Information.

**11.3.2 Limitations of Actions.** All claims and disputes covered by this provision must be submitted to arbitration by initiating the arbitration no later than 180 days after the aggrieved party became aware or should have become aware that the act or omission giving rise to the claim or dispute occurred, except for the failure to pay invoices for equipment purchased by Dealer from Company. The failure to initiate arbitration within this period is an absolute bar to the institution of any proceedings based on such act or omission. The aggrieved party must initiate arbitration under this provision by sending written notice of an intention to arbitrate to all parties. The notice must contain a description of the dispute, the amount involved, and the remedy sought. Notwithstanding any other limitations set forth in this Agreement, either party is entitled to assert counterclaims within 30 days from the date that it receives notice of any claim asserted against it.

**11.3.3 Procedures and Discovery.** A prehearing conference must take place to reach agreement on procedural matters, arrange for the exchange of information, obtain stipulations, schedule the arbitration hearing, and attempt to narrow the issues. In order to expedite the arbitration proceedings, the parties agree to place the following limitations on discovery:

(i) Each party may propound only 10 interrogatories (each subpart counting as one interrogatory) to each other party;

(ii) The parties may serve document requests. Responsive documents are to be exchanged no later than 45 days after service of the request;

(iii) Each party may depose up to 8 witnesses of each other party (including current and former employees and officers) and up to two non-party witnesses per each adverse party. Any party deposing an opponent's expert witness must pay the expert's fee for attending the deposition; and

(iv) Parties may conduct additional discovery beyond the limitations of these express rules only by written stipulation or express permission from the arbitrator upon a showing of good cause.

**11.3.4 Right to Seek Injunction.** Despite anything to the contrary in this arbitration provision, either party may bring court proceedings to seek an injunction or other equitable relief to enforce any right or obligation under this Agreement. To obtain injunctive or other equitable relief, neither party is required to post a bond, but if required by law or by the court, both parties consent to a bond in the lowest amount permitted by law.

**11.3.5 Enforcement of Award.** This Agreement provides no greater right of review than that which is conferred under applicable state and federal law. The award of the

arbitrator may be confirmed or enforced in any court having jurisdiction under the enforcement provisions of the Federal Arbitration Act.

**11.3.6 Fees.** Arbitrator's fees are split equally between the parties unless the arbitrator rules otherwise at the conclusion of the arbitration or this allocation is prohibited as a matter of law. If a party defaults on its obligation to pay, the non-defaulting party has the option to either: (a) make the missed payments and recover them at the conclusion of the arbitration regardless of who prevails, or (b) forego the use of the arbitration process and bring its claim to a court having jurisdiction. If the non-defaulting party brings its claim to a court having jurisdiction, then any statutory or contractual limitations period is tolled from the time that the arbitration was initiated until the matter is officially closed.

## 12.    MISCELLANEOUS.

**12.1    Governing Law.** Except to the extent governed by federal laws or regulations that preempt state law, the entire relationship of the parties based on this Agreement is governed by the substantive laws of the State of Georgia, without reference to its choice of law rules.

**12.2    Cumulative Rights/Waivers.** The rights of the parties under this Agreement are cumulative and not exclusive of any other rights or remedies. Either party's waiver of any right or remedy under this Agreement does not constitute a waiver of that same right or remedy or of any other right or remedy on a future occasion.

**12.3    Events Beyond a Party's Control.** Neither party is liable for loss or damage or is in breach of this Agreement if its failure to perform its obligations results from: (a) compliance with any law, order, regulation, or requirement of any federal, state, or local government, or any court of competent jurisdiction; (b) acts of God; or (c) fires, strikes, embargoes, war, terrorism, insurrection, riot, and other causes beyond the reasonable control of the party. Any delay resulting from any of these causes extends performance accordingly or excuses performance, in whole or in part, as may be reasonable.

**12.4    Entire Agreement.** This Agreement represents the entire agreement of the parties with respect to the subject matter of the Agreement. There are no other oral or written understandings or agreements between Company and Dealer relating to the subject matter of this Agreement, and this Agreement supersedes all prior negotiations, communications, agreements, and addenda between the parties with respect to the subject matter of this Agreement, but any releases or post-termination covenants are not superseded. Nothing in this Agreement is intended or should confer any rights or remedies upon any person or entity not a party to this Agreement.

**12.5    Modification.** This Agreement may only be amended or superseded by written agreement signed by authorized representatives of both parties, unless expressly permitted under the terms of this Agreement. Each written modification is effective only in the specific instance and for the specific purpose for which it was given. No course of dealing, course of performance, or usage of trade may be invoked to modify the terms and conditions of this Agreement. No other understandings or representations, whether oral or in writing, may amend or supersede this Agreement.

**12.6    Assignment.** Neither party may assign this Agreement or any of its rights or obligations under this Agreement without the other party's prior written consent, except that: (a) Company may fully assign its rights and duties under this Agreement to any affiliate, successor, or

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

to any entity or person in connection with a merger or consolidation of Company or with a sale of all or any portion of the assets or business of Company; and (b) Dealer may grant to an institutional lender as collateral for a loan or other credit facility a security interest in the other moneys payable to Dealer under this Agreement subject to the offset rights of Company provided in this Agreement and in any other agreement between Company and Dealer. Any material change of ownership or control of the legal entity of Dealer, whether voluntary or involuntary, constitutes an assignment of this Agreement. Any assignment by Dealer in violation of this section immediately renders this Agreement null and void and conveys no rights or interest.

**12.7   Survival.** The terms, provisions, representations, and warranties contained in this Agreement that by their sense, context, or express language are intended to survive do survive the termination of this Agreement. The parties must fulfill all surviving obligations in a timely manner, and these obligations are binding upon each party's respective successors and assigns. Regarding compensation to Dealer, no compensation, including without limitation Subscriber Management Fees, or other compensation related to Dealer's base of Subscribers under this Agreement or any amendment, survives the termination of this Agreement. The only compensation items that survive are: (a) Company's obligation to pay Dealer a one-time commission under the Compensation Schedule for a Subscriber who was activated before the termination of this Agreement and who remains on Service beyond the Chargeback Period; (b) Company's right to Chargeback Dealer under the relevant Compensation Schedule after termination, and Dealer' obligation to pay Company for these Chargebacks; and (c) Company's right of Offset/Recoupment.

**12.8   Severability.** A determination by a court or arbitrator of competent jurisdiction that any provision of this Agreement or any part of it is unenforceable does not cancel or invalidate the remainder of that provision or of this Agreement, which remain in full force and effect and must be construed to carry out the intent of the parties.

**12.9   Indemnity.** Dealer and Company must defend and indemnify the other party and its affiliates, parents, subsidiaries, and their employees and agents from all liability, damages, punitive damages, fines, expenses, including reasonable attorneys' fees and disbursements, claims, demands, or suits arising from their breach of this Agreement or non-compliance with law, their negligent, willful, or fraudulent acts, or for their failure to act, with respect to the performance of each party's obligations under this Agreement, including, without limitation, any allegedly unauthorized use of a trademark, patent, copyright, process, method, or device, false or misleading advertising, or bodily injury, death, or damage to property to the extent occasioned by the acts or omissions of the indemnifying party or its affiliates, employees, or agents. Prompt written notice must be provided to the indemnifying party of any claim for indemnity. Each party may conduct its own defense of any claim in which it is named as a defendant without diminishing its indemnity rights. This indemnity provision only applies to claims or liability from third parties and not to claims between the parties. Each party is only responsible for any losses or damages proximately caused by it. The Limitation of Liability provisions of this Agreement do not limit recovery under this Indemnity clause.

**12.10   Limitation of Liability.** EXCEPT TO THE EXTENT OTHERWISE PROVIDED UNDER THE INDEMNITY PROVISION, NEITHER COMPANY NOR DEALER IS LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, RELIANCE, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR EXEMPLARY DAMAGES, INCLUDING WITHOUT LIMITATION LOST PROFITS OR REVENUES, AS A RESULT OF ANY DEFAULT OR BREACH OF THIS AGREEMENT OR THE TERMINATION OR NON-RENEWAL OF THIS AGREEMENT OR ANY OTHER EVENT,

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

CONDUCT, ACT OR OMISSION ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER BASED ON CONTRACT, TORT, STATUTE, OR OTHERWISE. THIS LIMITATION OF LIABILITY IS MADE KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY.

**12.11 Notices.** All notices, requests, demands, and other communications under this Agreement, must be in writing and are considered given if delivered personally, sent by certified mail, return receipt requested, or sent by nationally recognized overnight carrier to the current address for official notices under this Agreement. The official addresses for notices of this Agreement may be changed by written notice to the other party in accordance with this section. However, Company's notices regarding Dealer Policies and compensation changes may also be delivered by facsimile, electronic means, or by U.S. Mail.

**SCHEDULE 1**
**Area & Approved Retail Locations**
(List only one Company market per page of Schedule 1.)

<u>Schedule 1 – New York/Northern New Jersey Market</u>

**Effective Date: March 19, 2006**

A.   **The market named above is comprised of the following locations:**

<u>New York Counties:</u>
Bronx, Kings (Brooklyn), Nassau, New York (Manhattan), Putnam, Queens, Richmond (Staten Island), Rockland, Suffolk, Westchester

<u>New Jersey Counties:</u>
Bergen, Essex, Hudson, Hunterdon, Middlesex, Monmouth, Morris, Ocean, Passaic, Somerset, Sussex, Union, Warren

B.   **Approved Retail Locations (in the Company market named above):**

<u>Approved Retail Locations:</u>                    <u>Effective Date of Operation:</u>

*See attached spreadsheet with the complete list of the 29 Approved Retail Locations on March 19, 2006.  The Effective Date of Operation for all 29 locations is March 19, 2006.*

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

exclu dlr - v.1, 7/1/05

Schedule 1 Attachment - March 19, 2006
Mojo Wireless
Exclusive Approved Retail Locations

| Old Agent Code | Address | City | State | Zip |
|---|---|---|---|---|
| BECD | 1913 King's Highway | Brooklyn | NY | 11229 |
| E186 | 80-19 37th Ave | Jackson Heights | NY | 11372 |
| E337 | 102 Washington Ave. | Dumont | NJ | 07628 |
| E398 | 1591 Flatbush Ave. | Brooklyn | NY | 11210 |
| E452 | 1530 A Oaktree Rd | Iselin | NJ | 08830 |
| E483 | 400 Montauk Hwy | East Hampton | NY | 11937 |
| E496 | 99 Nassau Street | New York | NY | 10038 |
| E497 | 698-B Third Ave. | New York | NY | 10017 |
| E499 | 5521 Bergenline Ave. | West New York | NJ | 07093 |
| E526 | 204 North Wood Ave. | Linden | NJ | 07036 |
| E555 | 2 East 14th Street | New York | NY | 10003 |
| E577 | 1707 Sheepshead Bay | Brooklyn | NY | 11235 |
| E603 | 469 Lexington Ave. | New York | NY | 10002 |
| FEA9 | 312 Brighton Beach Ave. | Brooklyn | NY | 11235 |
| 5E05 | 457 Broadway | Bayonne | NJ | 07002 |
| E132 | 66-76 Fresh Pond Rd. | Ridgewood | NY | 11385 |
| E199 | 495-14 South Broadway | Hicksville | NY | 11801 |
| E209 | 1402 Montauk Hwy | Mastic | NY | 11950 |
| E404 | 2013 Lemoine Ave | Fort Lee | NJ | 07024 |
| E466 | 260 Bergen Tpke | Little Ferry | NJ | 07643 |
| E529 | 108 Mamaroneck Ave | White Plains | NY | 10601 |
| E546 | 36-22a Union St. | Flushing | NY | 11354 |
| E576 | 78-23 Metropolitan Ave | middle village | NY | 11379 |
| E589 | 46 Larkfield Rd | East Northport | NY | 11731 |
| E602 | 1750 Mc Donald Avenue | Brooklyn | NY | 11230 |
| E213 | 159-05 Northern Blvd | Flushing | NY | 11357 |
| None | 769-791 Newark Ave | Jersey City | NJ | 07306 |
| None | 2278 Woodbridge Ave | Edison | NJ | 08817 |
| None | 160 Avenue A | New York | NY | 10009 |

**SCHEDULE 2/EXHIBIT C**
**COMPENSATION SCHEDULE – NYC- EXCLUSIVE**
**Effective Date: March 1, 2006**

1.    **Definitions.**

   **1.1    Activation Date.** The date on which Company begins to provide the applicable Service to any Authorized Subscriber.

   **1.2    Authorized Feature.** All published features that are generally available within the relevant market in the Area. Any data Authorized Rate Plan, if newly activated together with a voice Authorized Rate Plan by the same Authorized GSM Subscriber or Authorized Upgrade Subscriber constitutes an Authorized Feature.

   **1.3    Authorized Rate Plan.** Only the post-paid voice and data rate plans listed on Company's current point of sale rate plan collateral in each market within the Area. Authorized Rate Plans do not include Cingular GoPhone Rate Plans, Authorized Features (including data rate plans that constitute Authorized Features), demonstration plans or other dealer employee plans, and rate plans determined by Company under this Agreement to be non-authorized rate plans.

   **1.4    Authorized Subscriber.** All variations of Authorized Subscribers defined in this Compensation Schedule.

   **1.5    Cingular GoPhone Rate Plan.** All of the published GoPhone branded rate plans (prepaid/hybrid rate plans initially launched in April 2005) that are generally available within each market in the Area, including without limitation, GoPhone "Pay As You Go" and GoPhone "Pick Your Plan" rate plans. Authorized Subscribers activated on these Cingular GoPhone Rate Plans do not count towards Dealer's activation totals for compliance or compensation purposes, including without limitation any activation quota of Authorized Subscribers and any SMF or volume bonus, unless expressly stated in writing by Company.

   **1.6    Authorized GSM Subscriber.** An individual or entity who meets the following conditions:
   (a)    who places an order through Dealer for Service on a GSM Authorized Rate Plan (either voice or data) within the Area;
   (b)    for whom Dealer has activated a Company SIM together with certified GSM Equipment;
   (c)    for whom Service is activated on an Authorized Rate Plan, and is not deactivated before the end of the calendar month in which the Service was activated; **and**
   (d)    who has not been active on an Authorized Rate Plan at any time within 180 days before this Subscriber's Activation Date, except if it qualifies as a reactivation under this Compensation Schedule. When an individual or entity places more than one order and each order is assigned to a separate Company SIM (for a different wireless service number), each order is treated as a separate Authorized GSM Subscriber.

   **1.7    Authorized Upgrade Subscriber.** An individual or entity who meets the following conditions:
   (a)    a current Subscriber to any post-paid Company rate plan who meets Company's current upgrade eligibility requirements;
   (b)    who supplies with new certified GSM Equipment;
   (c)    for whom Dealer renews the term of Subscriber's contract with Company for at least one additional year on an Authorized Rate Plan, with the express consent of the Subscriber;
   (d)    for whom Dealer complies with Company's current upgrade eligibility requirements; **and**
   (e)    when an individual or entity places more than one order and each order is assigned a separate Company SIM (for a different GSM wireless service number), each order is treated as a separate Authorized Upgrade Subscriber.

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

exclu dlr - v.1, 7/1/05

**1.8    Authorized Feature Subscriber.** An individual or entity who meets the following conditions:

    (a)   who is an active post-paid or GoPhone Subscriber of Company, or is currently activating an Authorized Rate Plan or a Cingular GoPhone Rate Plan;

    (b)   who places an order through Dealer for an Authorized Feature;

    (c)   who is obligated to pay for the Authorized Feature in addition to the Subscriber's Authorized Rate Plan or Cingular GoPhone Rate Plan;

    (d)   for whom an Authorized Feature is activated and has not been deactivated before the end of the calendar month in which the Authorized Feature was activated; **and**

    (e)   when an individual or entity places more than one order for the same Authorized Feature and each order is assigned to a separate Company SIM (for a different wireless service number), each order is treated as a separate Authorized Feature Subscriber.

**1.9    Authorized GoPhone "Pay As You Go" Subscriber.** An individual or entity who meets the following conditions:

    (a)   who places an order for Service on a GoPhone "Pay As You Go" rate plan on certified GSM Equipment;

    (b)   for whom Service is activated on a GoPhone "Pay As You Go" rate plan and airtime is added to the account; **and**

    (c)   who has not been active on a GoPhone "Pay As You Go" rate plan at any time within 180 days before this Subscriber's Activation Date. When an individual or entity activates more than one Company SIM (for different wireless service numbers), each order is treated as a separate Authorized GoPhone "Pay As You Go" Subscriber.

**1.10    Authorized GoPhone "Pick Your Plan" Subscriber.** An individual or entity who meets the following conditions:

    (a)   who places an order for Service on a GoPhone "Pick Your Plan" rate plan on certified GSM Equipment;

    (b)   who makes the initial Service payment in full;

    (c)   for whom Service is activated on a GoPhone "Pick Your Plan" rate plan, and that is not deactivated before the end of the calendar month in which the Service was activated; **and**

    (d)   who has not been active on a GoPhone "Pick Your Plan" rate plan at any time within 180 days before this Subscriber's Activation Date. When an individual or entity activates more than one Company SIM (for different wireless service numbers), each order is treated as a separate Authorized GoPhone "Pick Your Plan" Subscriber.

**1.11**    For Dealers with legacy Agency Agreements, the following terms used in this Compensation Schedule have the corresponding meanings under the Agency Agreement: **"Dealer"** means "AGENT," **"Service"** means "WCS," and **"Company"** means "CINGULAR." **Subscriber** means any customer of Service.

**2.    Compensation.**

**2.1    Compensation Schedules.** Dealer earns the compensation set forth in Schedule 2.1/Exhibit C-1 for each Authorized Subscriber. If an Authorized GSM Subscriber activates only one Authorized Rate Plan per Company SIM, then that rate plan (voice or data) constitutes the primary Authorized Rate Plan. Dealer earns no compensation for activations on non-authorized rate plans.

**2.2    Compensation for Combined Voice and Data Subscribers.** If an Authorized GSM Subscriber activates voice and data rate plans together on the same Company SIM, then the voice Authorized Rate Plan constitutes the primary Authorized Rate Plan, which is compensated as an Authorized GSM Subscriber. The activation of the data Authorized Rate Plan does not constitute a separate Authorized GSM Subscriber and is compensated as an Authorized Feature Subscriber. If an Authorized Upgrade

Subscriber upgrades existing voice and data rate plans on the same Company SIM, then the voice Authorized Rate Plan determines Dealer's compensation, and no compensation is earned for the upgrade of the data rate plan.

2.3    **Adding a Voice Authorized Rate Plan Within the Chargeback Period.**  If an Authorized GSM Subscriber or an Authorized Upgrade Subscriber is using a data Authorized Rate Plan as a stand-alone plan (not combined with a voice plan on the same Company SIM), and if this Subscriber adds a voice plan to the same Company SIM within the Chargeback Period, then:

(a) the voice plan becomes the primary Authorized Rate Plan of the Authorized GSM Subscriber (subject to the Rate Plan change provision under Section 5 below) or of the Authorized Upgrade Subscriber; and

(b) the data Authorized Rate Plan deactivates and becomes an Authorized Feature eligible for compensation as an Authorized Feature Subscriber.

2.4    **Adding a Voice Authorized Rate Plan After the Chargeback Period.**  If a Subscriber or an Authorized Upgrade Subscriber is using a data Authorized Rate Plan as a stand-alone plan (not combined with a voice plan on the same Company SIM), and if this Subscriber adds a voice plan to the same Company SIM after the Chargeback Period has expired, then:

(a) the voice plan becomes the primary Authorized Rate Plan, but is not eligible for compensation; and

(b) the data Authorized Rate Plan becomes an Authorized Feature eligible for compensation as a Authorized Feature Subscriber.

2.5    **Compensation Terms.**  Each Approved Retail Location/Dealer location may be assigned a unique dealer code under which all Authorized Subscribers from that specific physical location must be activated to be eligible for compensation. Company will direct compensation to the Dealer that actually performs the activation based on the dealer code that is used during activation. All compensation will be paid or credited to Dealer by Company within 45 days of the end of the calendar month during which the activation occurred.

3.    **Chargebacks.**

3.1    **Chargebacks for Authorized Subscribers.**  If any Authorized Subscriber for which Dealer earned compensation under this Agreement deactivates, is deactivated, or changes to a rate plan that constitutes a deactivation as defined below, then Dealer must refund to Company all compensation earned by Dealer in any manner under this Agreement with respect to this former Subscriber ("Chargeback"). However, once earned, SMF is not subject to Chargeback. Subscriber suspensions will not trigger a Chargeback. The "**Chargeback Period**" or "**Vesting Period**" means the 180-day period beginning on the appropriate Activation Date where compensation is subject to Chargeback, except that any day or part of a day where a Subscriber is suspended does not count toward the Chargeback Period (and therefore will extend the Chargeback Period). Company will calculate all Chargeback amounts in its sole and absolute discretion and will automatically offset amounts owed to Dealer with amounts owed to Company under this Chargeback provision.

3.2    **Rate Plan Changes as Deactivations.**  If conducted within the Chargeback Period, the following rate plan changes by any Authorized Subscriber will constitute "deactivations" and will trigger a Chargeback:

(a) to a Cingular GoPhone Rate Plan from an Authorized Rate Plan;

(b) to an Authorized Rate Plan from a Cingular GoPhone Rate Plan;

(c) to a GoPhone "Pay As You Go" rate plan from a GoPhone "Pick Your Plan" rate plan; and

(d) to a GoPhone "Pick Your Plan" rate plan from a GoPhone "Pay As You Go" rate plan.

3.3    **Combined Voice and Data Subscribers.**  For all Authorized GSM Subscribers, if the primary Authorized Rate Plan of an Authorized GSM Subscriber is deactivated within the Chargeback Period, but the data Authorized Rate Plan remains active, then the data Authorized Rate Plan becomes the primary

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Authorized Rate Plan for this Authorized GSM Subscriber (subject to the Rate Plan change provision under Section 5 below), and any Authorized Feature Subscriber compensation originally earned by Dealer for the data Authorized Rate Plan is subject to Chargeback. Separately, if the data Authorized Rate Plan of an Authorized GSM Subscriber is deactivated within the Chargeback Period, but the primary Authorized Rate Plan remains active, then any Authorized Feature Subscriber compensation originally earned by Dealer for the data Authorized Rate Plan is subject to Chargeback.

**4.    Reactivation Within Chargeback Period.**

  **4.1    Newly Acquired Reactivation.** If any Authorized GSM Subscriber (not originally activated by Dealer) is deactivated within that Subscriber's Chargeback Period, and then reactivated with the same mobile number by Dealer back to an Authorized Rate Plan, this reactivated Subscriber is considered a new Subscriber for purposes of qualifying as an Authorized GSM Subscriber. However, a reactivated Authorized GSM Subscriber is not added to Dealer's Eligible Subscriber Base for SMF purposes.

  **4.2    Reactivation by Same Dealer.** If an Authorized GSM Subscriber of Dealer is deactivated within that Subscriber's Chargeback Period, and then reactivated with the same mobile number by Dealer back to an Authorized Rate Plan, this reactivated Subscriber is considered a new Subscriber for purposes of qualifying as an Authorized GSM Subscriber. However, for Chargeback purposes, the Subscriber's original Activation Date remains unchanged.

**5.    Rate Plan Changes.** If, within the Chargeback Period, an Authorized GSM Subscriber changes Service to another Authorized Rate Plan, within the same market for which a different amount of compensation is earned under this Compensation Schedule, Company will automatically make the appropriate monetary adjustment to the amount of compensation paid or credited to Dealer for that Authorized GSM Subscriber. If, within the Chargeback Period, the primary Authorized Rate Plan of an Authorized GSM Subscriber is deactivated but the data Authorized Rate Plan remains active, this event will constitute a rate plan change under this section where the data Authorized Rate Plan will change to the primary Authorized Rate Plan.

**6.    Service Transfers from Market to Market.** If an Authorized Subscriber processes its Service transfer from one Company market to another Company market through Company's relocation center, then no Chargeback will occur. However, if the Authorized Subscriber does not follow Company's relocation process, a Chargeback will occur if the Service transfer is within the Chargeback Period. In all cases and at all times, a Service transfer will result in that Subscriber being removed from Dealer's Eligible Subscriber Base.

**7.    Cooperative Advertising Funds.**

  **7.1    Cooperative Advertising Funds.** Dealer may earn cooperative advertising funds ("Coop Funds") that accrue in a cooperative advertising account ("Coop Account") for purposes of reimbursing Dealer for certain advertising or other approved expenses. In order to qualify for reimbursement from the Coop Account, Dealer must comply with any cooperative advertising Dealer Policies issued by Company. The amount of Coop Funds, if any, that will accrue for each Authorized GSM Subscriber is set forth on Schedule 2.1/Exhibit C-1.

  **7.2    Forfeiture of Funds.** All Coop Funds credited to the Coop Account will be permanently forfeited to Company if they are not used within the time frame and according to the Dealer Policies regarding Cooperative Advertising. No interest is paid to Dealer on funds credited to the Coop Account, and any amounts remaining in the Coop Account upon termination of the Dealer Agreement are permanently forfeited to Company.

**8.    Estimated Compensation.** Company reserves the right to estimate compensation due Dealer. This estimate will be revised and adjusted within 60 days based on Company's review of all relevant records concerning compensation due Dealer.

**9.    Subscriber Management Fee ("SMF").**

  **9.1    SMF Service Revenue.** SMF Service Revenue consists solely of the applicable month's billings for all monthly recurring charges for Authorized Rate Plans, Authorized Features on post-paid Authorized Rate Plans only, and additional local airtime charges billed to all Subscribers in Dealer's Eligible Subscriber

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Base (defined below) in each market. SMF Service Revenue is reduced by any Service discounts offered by Company to Subscribers. SMF Service Revenue does not include any other charges billed to Subscribers, including without limitation, amounts billed for activation fees, upgrade fees, roaming fees, fees for additional services, Cingular GoPhone Rate Plan charges, carryover balances from prior month's invoices, late payment fees, early termination fees, taxes, surcharges, assessments, or charges for any other Services that are not specifically identified as being within SMF Service Revenue.

**9.2    Dealer's Eligible Subscriber Base (for SMF purposes).** Dealer's Eligible Subscriber Base is maintained by Company separately for each individual market (as each market is defined in Company's compensation system) where Dealer is eligible for SMF. Under legacy Cingular Agency Agreements, Dealer's Eligible Subscriber Base is the base of post-paid Subscribers used by Company to calculate SMF under Dealer's previous Cingular Exhibit C regarding compensation as of August 31, 2005. Starting with the initial date of this SMF program, September 1, 2005, or at any time thereafter, only the following Subscribers will be added into Dealer's Eligible Subscriber Base: all Authorized GSM Subscribers that Dealer activates under this SMF program of the Dealer Agreement. However, Authorized GSM Subscribers that qualify as a reactivation under this Compensation Schedule are not added into Dealer's Eligible Subscriber Base. No other Subscribers will be added to Dealer's Eligible Subscriber Base, including without limitation, Authorized GoPhone "Pay As You Go" Subscribers, Authorized GoPhone "Pick Your Plan" Subscribers, Authorized Feature Subscribers, and Authorized Upgrade Subscribers, all of which are not included.

**9.3    Removal from Dealer's Eligible Subscriber Base.**

(A)  Once a Subscriber has canceled or has been deactivated from Service in Company's system, including without limitation transferring service from one Company market to another or changing rate plans from any post-paid rate plan to any Cingular GoPhone Rate Plan, that Subscriber is no longer eligible and will be removed from Dealer's Eligible Subscriber Base. However, a Subscriber that deactivates and then reactivates with the same mobile number remains in Dealer's Eligible Subscriber Base. Dealer's Eligible Subscriber Base is determined by Company and is based solely on Company's records. Dealer's Eligible Subscriber Base is the base of Subscribers that Company uses to determine both Dealer Churn Rate and the amount of SMF that Dealer earns.

(B)  Company may, at its discretion, remove all Subscribers from Dealer's Eligible Subscriber Base who were activated at a specific retail location if Dealer ceases to operate this location or otherwise transfers its interest in the location. Removal takes effect on the date of closure or transfer. However, if within 6 months after closure or transfer, Dealer opens and operates an alternate retail location in the same market that is approved in writing in advance by Company, then the Subscribers that remain active as of the date the alternate retail locations opens for business may be reinstated into Dealer's Eligible Subscriber Base. Company has the sole and absolute right to approve or not approve any proposed alternate retail location.

**9.4    Dealer Churn Rate.** Dealer is eligible to earn a monthly SMF for each Company market depending upon its Dealer Churn Rate in each individual market where Dealer is eligible for SMF under this Agreement. *(For compensation purposes, including for calculating Dealer Churn Rate, each individual market is defined as the area that Company considers a market in its compensation system. This area may be smaller than the entire area where Dealer sells Service and may result in Dealer earning SMF in one portion of its market, but not in other portions.)* Dealer Churn Rate is a single number based on the actual Subscriber post-paid churn rate of Dealer's Eligible Subscriber Base in each individual eligible market and is measured solely by Company, using Company's records, rounded to the hundredth decimal place ("Dealer Churn Rate"). The formula Company uses to calculate Dealer Churn Rate is as follows. The number of Subscribers in Dealer's Eligible Subscriber Base at the beginning and end of any month added together and then divided by 2 is the Dealer's Average Eligible Subscriber Base. The Dealer Churn Rate is the number of Subscribers in Dealer's Eligible Subscriber Base that deactivated from Company's systems in the relevant market in a month divided by Dealer's Average Eligible Subscriber Base for that same month.

**9.5    SMF Earned on Dealer's Eligible Subscriber Base.** SMF is not paid for past service, but rather, is paid for Dealer's current services under this Agreement, including without limitation, activating new Subscribers, servicing existing Subscribers on Company's behalf, achieving its churn requirements, and keeping this Agreement in effect. Accordingly, Dealer has no vested interest in SMF and the Subscribers remain Company's Subscribers at all times. SMF is a potential monthly payment expressed and calculated as a percentage of Dealer's SMF Service Revenue in the applicable month in each individual market where

Dealer is eligible for SMF. SMF, if any, may be earned monthly, where Dealer is eligible, based on Dealer's prior month Dealer Churn Rate and on the corresponding SMF percentage set forth in Schedule 2.1/Exhibit C-1. Dealer will earn no SMF in any month in which it does not achieve the Dealer Churn Rate set forth in Schedule 2.1/Exhibit C-1 for any individual market. Dealer's SMF eligibility and the calculation of Dealer's SMF are specific to each market where Dealer operates.

9.6    **Termination of SMF.** Dealer does not earn and will not be paid any SMF after the termination of the Dealer Agreement for any reason. As a result, all SMF will stop immediately upon termination of the Agreement under all circumstances. Further, Company, in its sole discretion, may terminate or suspend payment of Dealer's SMF for any month in which Dealer fails to achieve any SMF qualification requirement as provided in the Agreement.

10.    **Modification.** Company may modify the terms and conditions or the payment amounts of every type of compensation listed in this Compensation Schedule in any way with at least 30 days advance written notice to Dealer. Company may, without advance notice to Dealer, stop offering any Service plans, or may introduce new or revised Service plans and new services with different compensation than what is set forth in this Compensation Schedule.

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

### SCHEDULE 2.1 /Exhibit C-1
### Compensation Schedule – Exclusive
### Effective Date:  March 1, 2006
### Effective only in the Company Markets within the Area that are listed below

### Market:  New York/Northern New Jersey

I.    **AUTHORIZED SUBSCRIBER COMPENSATION (excluding Authorized Feature Subscribers)**

1.A.    **Authorized GSM Subscribers.**

| Authorized Rate Plan Monthly Recurring Charge | Compensation per Authorized GSM Subscriber (2-Year Term) | Compensation per Authorized GSM Subscriber (1-Year Term) | Compensation per Authorized GSM Subscriber (No Term) |
|---|---|---|---|
| $0 - $35 | $140 | $65 | $0 |
| $35.01 - $45 | $220 | $145 | $0 |
| $45.01 - $55 | $275 | $200 | $0 |
| $55.01 - $75 | $360 | $285 | $0 |
| $75.01 + | $440 | $365 | $0 |

1.B.    **Coop Accrual per Authorized GSM Subscriber = $20**

2.    **Authorized Upgrade Subscribers**

| Authorized Rate Plan Monthly Recurring Charge | Compensation per Authorized Upgrade Subscriber (2-Year Term) | Compensation per Authorized Upgrade Subscriber (1-Year Term) |
|---|---|---|
| $0 - $35 | $80 | $5 |
| $35.01 - $45 | $125 | $50 |
| $45.01 - $55 | $150 | $75 |
| $55.01 - $75 | $200 | $125 |
| $75.01 + | $250 | $175 |

3.    **Authorized GoPhone "Pay As You Go" Subscriber = $35**

4.    **Authorized GoPhone "Pick Your Plan" Subscriber = $60**

5.    **Subscriber Management Fee (SMF):**
* Dealer Churn Rate at or below 3% = 5 Percent of Dealer's SMF Service Revenue
* Dealer Churn Rate above 3% = NO SMF

II.    **AUTHORIZED FEATURE SUBSCRIBER COMPENSATION & CHARGEBACK**

**1. Post-Paid Features.**    Each Authorized Feature Subscriber on a post-paid Authorized Rate Plan earns 4 times the monthly recurring charge of the Authorized Feature, up to a maximum compensation of $100. Company will Chargeback each Authorized Feature Subscriber on a post-paid Authorized Rate Plan at 3 times the monthly recurring charge of the Authorized Feature, up to a maximum Chargeback of $75.

**2.    GoPhone Pick Your Plan Features.**    Each Authorized Feature Subscriber on a GoPhone "Pick Your Plan" rate plan earns one time the monthly recurring charge of that Authorized Feature, which amount is subject to complete chargeback during the 180-day Chargeback Period.

**3.**    However, there is no compensation for any handset insurance Authorized Feature.

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

## TRANSITION AGREEMENT AND GENERAL RELEASE
### ("General Release")

This General Release is effective as of March 18, 2006 (the "Effective Date"), between Eastern Regional Communications, Inc., with its principal offices at 106 S. State Street Hackensack, New Jersey 07601 ("Dealer") and Cingular Wireless II, LLC ("Cingular"), for itself and on behalf of its affiliates that control, are controlled by, or are under common control with Cingular, including without limitation, Southwestern Bell Mobile Systems, LLC.

Cingular and Dealer are parties to a Non-Exclusive Authorized Agency Agreement for the New York market dated March 19, 2003 ("Agency Agreement"). Cingular and Dealer have entered into a Cingular Wireless Exclusive Dealer Agreement and a Performance Amendment to Exclusive Dealer Agreement, each dated March 19, 2006 (collectively, the "Exclusive Agreement"). The parties seek to amicably end the relationship under the Agency Agreement and to facilitate the transition to the Exclusive Agreement.

The parties agree as follows:

**1. Agreement Transition. (a)** The Agency Agreement will expire at midnight on March 18, 2006. Cingular will pay all commission and subscriber management fees ("SMF") earned through that date to Dealer, but no further commission or SMF will be earned by Dealer under the Agency Agreement after March 18, 2006. Cingular has agreed to continue a distribution relationship with Dealer and has further agreed to continue certain SMF eligibility as described in the Exclusive Agreement.

**(b)** All Chargebacks and any other money owed by Dealer to Cingular under the Agency Agreement on or after March 18, 2006 will be transferred to the Exclusive Agreement and assumed by Dealer under the Exclusive Agreement on March 19, 2006. A further explanation of the parties' agreement related to Chargebacks under the Agency Agreement is contained in the Exclusive Agreement.

**(c)** As of the day this General Release is fully executed, Cingular is permitted to begin soliciting Dealer's Sub-Agents under the Agency Agreement to exclusively distribute directly for Cingular and to advise other Master Dealers to solicit these Sub-Agents to distribute Cingular services starting on March 19, 2006. Dealer agrees to waive enforcement of any agreements it may have with its Sub-Agents restricting them from selling Cingular service for another master dealer or directly with Cingular. Dealer agrees to pay all amounts due to its Sub-Agents in a timely manner under the Agency Agreement and to assist in the transition to other master dealers as needed. Cingular will not solicit nor advise other master dealers to solicit the Approved Retail Locations listed on Schedule 1 to the Exclusive Agreement.

**(d)** As of the Effective Date, Dealer will assist Cingular in protecting Cingular's brand and trademarks by using Dealer's leverage (financial or otherwise) and influence with its former Sub-Agents to remove the Cingular brand and trademarks from these Sub-Agents' retail locations as directed by Cingular.

**2. General Release.** Dealer and its affiliates hereby forever release, waive and discharge Cingular, any parent company or subsidiary, and any company, partnership, joint venture or other entity owned or controlled by or affiliated with Cingular, and any general partners thereof, and any predecessors, successors, or assigns, and the officers, directors, attorneys, agents, employees, and shareholders of each of the foregoing (collectively, the "Cingular Released Parties") from any

Cingular Wireless Proprietary & Confidential
Use according to Cingular's Instructions

1

and all claims, obligations, promises, causes of action or demands, known or unknown, of any nature whatsoever, that Dealer or its affiliates may have, individually or jointly with another party, and any claims for attorneys' fees. This release is general in nature and applies to all claims resulting from anything that has occurred up to the Effective Date. However, any unresolved compensation disputes under the Agency Agreement from November 2005 until its expiration date of March 18, 2006 are not released and will be resolved in the normal course of business.

3.  **Successor and Assigns.** This General Release binds any person, successor, assign, trustee, receiver, or legal representative thereof that succeeds to Dealer's rights or liabilities. This General Release is made for the benefit of all Cingular Released Parties and all parties that succeed to their rights or responsibilities, including without limitation, their successors and assigns.

4.  **Waiver Regarding Unknown Claims.** This General Release is intended to be in the broadest form possible. Dealer hereby expressly waives any laws or statutes that provide that a general release does not extend to claims not known or suspected to exist at the time of execution of the general release that if known would have materially affected the decision to give this General Release. This General Release expressly extends to any such unknown or unsuspected claims, even if knowledge thereof would have materially affected the decision to give this General Release.

5.  **Covenant Not To Sue.** Dealer hereby expressly covenants and agrees forever to refrain from bringing any suit or proceeding at law or in equity against any and all of the Cingular Released Parties and their successors in interest or assigns, arising out of or in any way related to any matter, cause or claim whatsoever up to the Effective Date, including but not limited to claims for attorneys' fees.

6.  **Miscellaneous.**   a.  This General Release is governed by, and interpreted under the laws of the State of Georgia.

b.  This General Release does not constitute an admission of any wrongdoing on the part of any party.

c.  The terms and conditions of this General Release constitute Confidential Information under the terms of the Agency Agreement and the Exclusive Agreement.

d.  This General Release constitutes the entire agreement between the parties with respect to the subject matter hereof, all oral agreements being merged herein, and all prior representations and agreements are superseded. There are no representations, agreements, arrangements, or understandings, oral or written, between or among the parties relating to the subject matter of this General Release that are not fully expressed herein.

e.  All capitalized terms in this General Release have the same meaning as in the Agency Agreement, unless another meaning is expressly specified herein

Cingular Wireless Proprietary & Confidential
Use according to Cingular's Instructions

f. This General Release has been carefully read by all parties and the contents hereof are known and understood. Dealer has the opportunity to receive independent legal advice from attorneys of its choice with respect to the review and advisability of executing this General Release.

Agreed and Accepted:

**Cingular Wireless II, LLC** ("Cingular") for itself and on behalf of its affiliates that control, are controlled by, or are under common control with Cingular, including without limitation, Southwestern Bell Mobile Systems, LLC

Signed: _____

Printed:  Thomas DeVito
Title:  Vice President/General Manager

Date:  _____

Easter Regional Communications, Inc

Signed: _____

Printed:  Albert Benjamin

Title:  Executive Vice President

Date:  3-17-06

y/mlm/cing – ny/dealers/contracts/2006/ERC  release 3-06
Cingular Wireless Proprietary & Confidential
Use according to Cingular's Instructions

## PERFORMANCE AMENDMENT
## TO EXCLUSIVE DEALER AGREEMENT

The March 19, 2006 Cingular Wireless Exclusive Dealer Agreement ("Dealer Agreement") between Cingular Wireless II, LLC on behalf of its affiliated companies operating in the Area ("Company") and Eastern Regional Communications, Inc. ("Dealer") is hereby amended only as expressly stated in this Performance Amendment to Exclusive Dealer Agreement ("Performance Amendment"). This Performance Amendment is effective on March 19, 2006 and terminates automatically when the Dealer Agreement terminates.

The parties agree as follows:

1.   (a)   In accordance with the March 18, 2006 Transition Agreement and General Release entered into between the parties, the Non-Exclusive Authorized Agency Agreement for the New York market dated March 19, 2003 between Southwestern Bell Mobile Systems, LLC and Dealer ("Agency Agreement") terminates on March 18, 2006 and no further commission or SMF will be earned by Dealer under the Agency Agreement after March 18, 2006. However, Dealer has transferred 26 Sub-Agent retail locations from the Agency Agreement as Approved Retail Locations under Schedule 1 of the Dealer Agreement (the "Transferred ERC Locations"). On March 19, 2006, Company will transfer to the Dealer Agreement Dealer's Eligible Subscriber Base previously associated only with the Transferred ERC Locations under the Agency Agreement as of March 18, 2006 (the Transferred Subscriber Base"). As a result, Dealer is eligible to earn subscriber management fees ("SMF") under the Compensation Schedule of the Dealer Agreement starting on March 19, 2006 based on the Transferred Subscriber Base. Moreover, Dealer's Churn Rate under the Compensation Schedule of the Dealer Agreement will be based on the churn from the Transferred Subscriber Base.
(b)   All Chargebacks from the Agency Agreement are being transferred to the Dealer Agreement and assumed by Dealer on March 19, 2006. The full Chargeback Period of 180 days applies to all of the Transferred ERC Locations. However, Company has agreed to reduce the length of the Chargeback Period from 180 days to 120 days on all Sub-Agents under the Agency Agreement that are not included in the Transferred ERC Locations. In exchange, Dealer agrees to reduce the length of the chargeback period to 120 days in Dealer's agreement with its former Sub-Agents that are not included in the Transferred ERC Locations.

2.   (a)   Dealer is only permitted to have and Company will only approve retail locations under the Dealer Agreement that have a single Dealer brand name, which Dealer has selected to be "Mojo Wireless." All of the Transferred ERC Locations must be branded externally with the Mojo Wireless brand name and with the Cingular marks showing Cingular Authorized Retailer in accordance with Company's branding guidelines by June 1, 2006.
(b)   At all times, Dealer must exercise total control of all Approved Retail Locations and Dealer is fully responsible for their compliance with all terms and conditions of the Dealer Agreement.
(c)   Dealer specifically acknowledges the importance of its contractual requirement that each dealer code is strictly associated with one specific physical Approved Retail Location (also contained in the Dealer Policy "Each Dealer Code Associated With One Physical Location Only"). Dealer is solely responsible for ensuring that the dealer codes assigned by Company for activations of subscribers physically within each of Dealer's Approved Retail Locations must not be used at any other locations, by any other entities,

or in other manner. Absolutely no sub-dealers are permitted under the Dealer Agreement. Company will not permit blame for any dealer code violation to be shifted to the owner of any Approved Retail Location or any other third party. Dealer is solely responsible for guarding its dealer codes securely. *Dealer understands and acknowledges that any violation of this provision or any other misuse of Dealer's dealer codes constitutes a material breach of the Dealer Agreement and will result in immediate termination of the entire Dealer Agreement without any opportunity to cure. In addition to termination of the Dealer Agreement, Dealer will be required to pay Company liquidated damages of 2 times the amount of compensation paid by Company for all activations performed under Dealer's dealer codes in violation of this provision. This provision serves as Dealer's warning and these remedies will be implemented on the first violation with no further warning to Dealer.*

(d)   The initial 26 Transferred ERC Locations, plus 3 additional Approved Retail Locations approved by Cingular before March 19, 2006 are the only 29 Approved Retail Locations for which Dealer is not required to have total ownership or to have its name on the lease. Following this one-time waiver, any additional Approved Retail Locations must be owned 100% by Dealer, or the lease must be solely in Dealer's name in full compliance with the Dealer Agreement.

3.   If, in Company's sole discretion, a Company-owned retail store opens nearby an Approved Retail Location of Dealer, then Company may require Dealer to stop selling Company's Service at that Approved Retail Location with 60 days advance written notice to Dealer. In this event, Dealer will be permitted to retain all subscribers activated from that Approved Retail location in Dealer's Eligible Subscriber Base for SMF purposes.

4.   (a)   The Dealer Agreement requires Dealer to exclusively sell Company wireless services (prepaid and post-paid) in all Approved Retail Locations within the Area. This exclusivity provision remains in effect and will be strictly enforced at the exclusive Approved Retail Locations under the Dealer Agreement beginning on March 19, 2006.

(b)   The Dealer Agreement also requires Dealer and its Affiliates to not sell any Competitive Service even outside of the Approved Retail Locations within the Area. However, outside of the Approved Retail Locations, Company hereby grandfathers the 3 Competitive Service providers with which Dealer is already conducting business – Locus Telecommunications, Helio, and Sprint Nextel, including all subsidiaries. As a result, Company is waiving the exclusivity provision of the Dealer Agreement only for Locus Telecommunications, Helio, and Sprint Nextel outside of the Approved Retail Locations, except that Dealer and its Affiliates are not permitted to directly or indirectly sell Locus Telecommunications, Helio, or Sprint Nextel service adjacent to or from the same retail space as Dealer's Approved Retail Location. Dealer must not disparage Company's Service in order to sell Competitive Service and must actively promote Company's Service at all times. Finally, if Dealer stops doing business with Locus Telecommunications, Helio, or Sprint Nextel or its successor, then this waiver will expire and the Dealer Agreement will revert to its original completely exclusive status, subject to further negotiations between the parties.

5.   Dealer understands and acknowledges that reduction of subscriber churn is one of Company's most important corporate goals and that Dealer is expected to help Company achieve this goal and to never take any action inconsistent with this goal. Dealer understands and acknowledges that the numerical churn rate required for Dealer to be eligible for SMF under the Dealer Agreement will be reduced in the immediate future and will continue to be reduced further by Company over time. Dealer understands and acknowledges that if Dealer does not achieve its churn requirement as set forth in any Compensation

Schedule to the Dealer Agreement and as a result does not receive its SMF under the Dealer Agreement, there will be no waiver or forgiveness from the churn requirement.

6.   If Company determines in its sole discretion that excessive subscription fraud or any other type of fraudulent activity takes place at any Approved Retail Location, Company may require Dealer to forfeit its entire next SMF payment.

7.   This Performance Amendment sets forth the minimum performance requirements that Dealer must comply with for its Approved Retail Locations to remain authorized and to keep the Dealer Agreement in effect. The uncured breach of any of these minimum performance requirements is a material breach of the Dealer Agreement that may result in remedies, including without limitation, the removal of Approved Retail Locations and up to termination of this Dealer Agreement.

If Dealer does not satisfy all of the minimum performance requirements in any month, Company may send a written notice of breach and opportunity to cure to Dealer listing the specific requirements that are not being met at specific Approved Retail Locations. Dealer will have 90 days from the date of this notice to cure each breach of the minimum performance requirements. If, after this cure period, any breach of these minimum performance requirements remains uncured, Company may require Dealer to stop selling Company Service at any Approved Retail Location that remains in breach of even one minimum performance requirement.

The initial set of minimum performance requirements listed below begins immediately, but Company will not begin enforcement procedures until July 2006. These minimum performance requirements will remain in effect until further notice and any modifications to them will be set forth by Company in a Dealer Policy with at least 30 days advance notice in accordance with section 4.9 of the Dealer Agreement.

a. Dealer must maintain a monthly post-paid churn rate below 2.25 percent for every individual Approved Retail Location. Churn will be calculated based on Dealer's Eligible Subscriber Base associated with the dealer code of each individual Approved Retail Location.
b. Dealer must achieve a monthly percentage of at least 90% of its Authorized GSM Subscriber activations on 2 year contracts at every individual Approved Retail Location.
c. Dealer must perform at least 70 activations of Authorized GSM Subscribers per month at each Approved Retail Location.
d. Dealer must maintain a monthly average of at least $8 of post-paid Authorized Feature Subscriber monthly recurring charge revenue per post-paid opportunity (Authorized GSM Subscribers and Authorized Upgrade Subscribers combined) at every individual Approved Retail Location.
e. Dealer must achieve a mystery shop score of at least 85 at every individual Approved Retail Location each month.

8.   (a)   When any Approved Retail Location under the Dealer Agreement closes down, no longer carries the Mojo Wireless brand or the Cingular brand, or stops selling Company's Service under any circumstances, including without limitation failure to achieve all of its minimum performance requirements, the Subscribers activated from that Approved Retail Location will immediately be removed from Dealer's Eligible Subscriber Base and Dealer will no longer be eligible for SMF from that location.
(b)   However, if Dealer plans on relocating an Approved Retail Location in the immediate vicinity of the

original location and if Cingular, in its sole discretion, approves this relocation in writing and in advance of the closure of the original location, then the Subscribers activated from the closed location will be transferred under the relocated Approved Retail Location. Dealer must provide Company with the full 90 days advance written notice of the closure under the Dealer Agreement, and the relocated Approved Retail Location must open for business and be properly branded within 60 days after the original location closes.

(c)   If Cingular requires an Approved Retail Location to stop selling Service under section 3 of this Performance Amendment, then the Subscribers activated at that Approved Retail Location will not be removed from Dealer's Eligible Subscriber Base.

9.   All capitalized terms in this Performance Amendment have the same meaning as in the Dealer Agreement, unless another meaning is expressly specified herein. Except as modified in this Performance Amendment, all terms and conditions of the Dealer Agreement remain in full force and effect. To the extent of a conflict between the terms and conditions of this Performance Amendment and the terms of the Dealer Agreement (including without limitation the Compensation Schedule), the terms of this Performance Amendment control. The terms of this Performance Amendment constitute Confidential Information under the Dealer Agreement.

10.   This Performance Amendment and the Dealer Agreement constitute the entire agreement between the parties with respect to the subject matter hereof, all oral agreements being merged herein, and all prior representations and agreements are superseded.

Cingular Wireless II, LLC, on behalf
of its affiliated companies operating in
the Area

By: _____
Name: Tom DeVito

Title: Vice President/General Manager

Date: _____

Eastern Regional Communications, Inc.

By: _____
Name: Albert Benjamin

Title : Executive Vice President

Date: _____3-17-06_____

**B**

at&t

March 18, 2009

**BY E-MAIL, PERSONAL DELIVERY & OVERNIGHT MAIL**
Mr. Howard Back
Eastern Regional Communications, Inc.
205 S. State Street
Hackensack, NJ 07601

### NOTICE OF TERMINATION OF EXCLUSIVE DEALER AGREEMENT

Dear Mr. Back:

Effective immediately, AT&T hereby terminates the Exclusive Dealer Agreement with Eastern Regional Communications, Inc. d/b/a Mojo Wireless for cause. The basis for the termination is our recent discovery of additional fraudulent conduct occurring at two of Mojo's approved retail locations and the overall pattern of fraud that has occurred at several of Mojo's approved retail locations, which we discovered over the past year. This fraudulent conduct amounts to numerous breaches of the Dealer Agreement and has caused substantial harm to AT&T. Accordingly, AT&T is exercising its right to terminate for cause immediately upon written notice pursuant to Section 10.3 of the Dealer Agreement.

I will not restate here the various instances of rebate fraud and handset insurance fraud involving other Mojo locations, including that which I previously set forth at length in my letters of April 14, 2008, July 31, 2008, and October 28, 2008. Indeed, those letters and the underlying documentation that we provided to you speak for themselves, and demonstrate that this fraud collectively caused hundreds of thousands of dollars of harm to AT&T.

Notwithstanding Mojo's attempt to explain away the insurance fraud that occurred at Mojo's 159-05 Northern Blvd. location in Queens as "outstanding customer service," per your November 7, 2008 letter, we have reviewed our records, as well as the customer statements Mojo submitted, and have confirmed that fraud occurred. Indeed, if Mojo truly was replacing subscribers' lost or damaged handsets out of its own inventory and then restocking its inventory with the handsets received as a result of insurance claims processed on the subscribers' behalf, then the subscribers' handsets/IMEIs would have changed at or around the time of the insurance claim. But our records show that many of the subscribers on whose behalf insurance claims were processed *continued* using the same purportedly lost, damaged, or stolen handset *after* the insurance claim was filed. And, some of the handsets shipped as a result of the insurance claims — these subscribers -- which were shipped to the Northern Blvd. store — now are being used by these subscribers.

The most recent fraudulent conduct we uncovered involves handset insurance fraud at Mojo's 1655-278 Oak Tree Road, Edison location and Mojo's 166 Avenue A, Manhattan store. While we will not set forth each and every detail of the sophisticated scheme here,

Howard Back
Page 2

Between September 2008 and February 2009, a substantial number of subscriber accounts improperly were accessed via Pos.com under dealer codes linked to Mojo's Oak Tree Road and Avenue A locations. Multiple fraudulent insurance claims were made on certain of these accounts (some of which have little or no call activity before or after the claims). In some instances, not only were the shipped insurance handsets not registered on the appropriate account, but no replacement handsets were registered on the account *at all* after the insurance claims were made. And, just like the fraud that occurred at Northern Blvd., many of the insurance handsets are now being used by other subscribers, including some that were used to activate or upgrade service under a Mojo dealer code.

Further, common credit cards that trace to a business located at 160 Avenue A were used to make payment on some of these accounts (which, standing alone, is a violation of the Dealer Agreement). And, shortly after some of these accounts were accessed by the Oak Tree Road or Avenue A locations, calls were made to AT&T customer care requesting credits on the accounts due to the "customers'" purported inability to use their handsets.

As you know, AT&T discovered rebate fraud at the Oak Tree Road location just a few months ago. As a good faith gesture made in reliance on Mojo's assurances to cure the problems, AT&T permitted Mojo to take over this store directly, re-open it, and keep the Eligible Subscriber Base associated with the location. That additional fraud occurred at the Oak Tree Road location *after* Mojo assumed direct management control of the store is troubling to say the least. Regardless, we are still investigating the scope of the recently-discovered fraud to determine the extent of harm to AT&T, which is in any event substantial.

AT&T has given Mojo every opportunity to fix the serious problems at its approved retail locations. Despite Mojo's repeated representations that there would be no more fraud, the fraud continues unabated. Moreover, Mojo is itself directly implicated in the fraudulent conduct. Accordingly, for the reasons discussed, AT&T hereby terminates the Dealer Agreement for cause, effective immediately.

Please be advised that AT&T reserves all rights under the Dealer Agreement and under applicable law. Please be advised further that Mojo is responsible for complying with all post-termination obligations under the Dealer Agreement.

Very truly yours,
AT&T Mobility II, LLC

Robert Rizzi
Director of Indirect Sales

Thomas DeVito

C

## BRODERICK, NEWMARK & GRATHER

A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

20 SOUTH STREET

SUITE 3

MORRISTOWN, N.J. 07960

(973) 538-0084

FAX (973) 538-2509

www.bnglawyers.com

EDWARD F. BRODERICK, JR*
MARTIN NEWMARK
FRANCIS G. GRATHER*
ALAN J. BALDWIN*

* CERTIFIED BY THE SUPREME COURT
  OF N.J. AS A CIVIL TRIAL ATTORNEY
* FELLOW AMERICAN ACADEMY OF
  MATRIMONIAL LAWYERS

E. F. BRODERICK (1929-1987)
I. EZRA NEWMARK (1925-1979)

March 19, 2009

VIA EMAIL

Matthew J. Fedor, Esq.
Drinker Biddle & Reath LLP
500 Campus Drive
Florham Park, NJ 07932

Re:  Eastern Regional Communications, Inc. v. AT&T

Dear Mr. Fedor:

The undersigned represents Eastern Regional Communications, Inc. (herein ERC), Dealer under a certain Exclusive Dealer Agreement effective March 19, 2006 between ERC and AT&T's predecessor, Cingular Wireless II, LLC. A copy of the Agreement is submitted herewith. I am writing on their behalf in response to the purported termination of that Agreement as set forth in a letter dated March 18, 2009 over the signature of Robert Rizzi (herein Rizzi), Director of Indirect Sales.

Initially it is important to note that despite language to the contrary in the Agreement (see Section 2.3) the relationship between the parties is that of a Franchisor and Franchisee. See N.J.S.A. 56:10-3 and Section 9.1 of the Agreement by which AT&T authorizes ERC to use its trademarks, etc.

As you know it is a violation of the New Jersey Franchise Act for a Franchisor to terminate or fail to renew a franchise without having first given written notice setting forth all of the reasons for such termination or intent not to renew to the Franchisee sixty (60) days in advance of such termination or failure to renew. See N.J.S.A. 56:10-5. The termination or failure to renew must be for good cause. id.

Accordingly, the March 19, 2006 Agreement did not expire or otherwise lapse on March 18, 2008 but continued in full force and effect. This appears to have been acknowledged by Rizzi who references the Agreement in his March 18, 2009 termination letter.

March 19, 2009
Page 2

I call your attention to Section 11 of the Agreement. This letter will serve as Notice as provided for in Section 11.1 that ERC as Dealer disputes the purported termination of the relationship contemplated by the Agreement and invokes all of the Dispute Resolution provisions of Section 11 including but not limited to all of the Mandatory Pre-Arbitration Dispute Resolution Procedures set forth in Section 11.2. Accordingly, this will serve as a request to meet with an appropriate representative of your client within fourteen (14) days at a mutually agreed time so that a good faith attempt to resolve this dispute can take place. Kindly suggest an agreeable time and place.

Since it clearly appears that the purported termination is premature having been invoked without the required sixty (60) day notice and in light of the invocation of the Dispute Resolution Procedures provided for in the Agreement – which was, of course, dictated by the Franchisor – it was legally unjustified for AT&T to terminate the Agreement at this time, cancel the Dealer Codes and effectively put ERC out of business.

Accordingly, in the absence of immediate written confirmation by you that pending the Procedures provided for in Section 11, including Arbitration, that all of the Dealer Codes will be reactivated and that all of ERC's entitlements under the Agreement will be reinstated, we will immediately file an action in the Chancery Division of the Superior Court seeking a Temporary Restraining Order. I am enclosing an unpublished Opinion of the Appellate Division supporting that relief in circumstances strikingly similar to those involved here.

I look forward to your prompt and favorable response.

Very truly yours,

Martin Newmark

MN:mmo
Enclosures
cc:  Howard Back
     Lee M. Levitt, Esq.

2

**BRODERICK, NEWMARK & GRATHER**
A Professional Corporation
20 South Street, Suite 3
Morristown, NJ 07960
973-538-0084
Attorneys for Plaintiff

|  |  |
|---|---|
| EASTERN REGIONAL COMMUNICATIONS, INC., d/b/a MOJO WIRELESS | :SUPERIOR COURT OF NEW JERSEY :MORRIS COUNTY-CHANCERY DIVISION : :Docket No: |
| Plaintiff, | : Civil Action |
| vs. | : ORDER TO SHOW CAUSE WITH |
| AT&T MOBILITY, LLC | : TEMPORARY RESTRAINTS : PURSUANT TO R.4:52 |
| Defendant. | : : |

THIS MATTER being brought before the Court by Alan J. Baldwin, Esq., attorney for plaintiff, Eastern Regional Communications, Inc., d/b/a Mojo Wireless, seeking relief by way of temporary restraints pursuant to R.4:52, based upon the facts set forth in the Verified Complaint filed herewith; and it appearing that the defendant has notice of this application and for good cause shown.

It is on this _____ day of _____, 2009 ORDERED that defendant, AT&T Mobility, LLC, appear and show cause before the Superior Court at the Morris County Courthouse in Morristown, New Jersey at _____ o'clock in the _____ noon or as soon thereafter as counsel can be heard, on the _____ day of _____, 2009 why an Order should not be issued preliminarily enjoining and

restraining defendant, AT&T Mobility, LLC, as follows

1.   AT&T may not terminate plaintiff for cause under the Exclusive Dealer Agreement executed on March 18, 2006 (the "Contract") for the reasons set forth in the March 18, 2009 termination letter (attached to the Verified Complaint as Exhibit B) unless and until plaintiff's dispute regarding the propriety of that termination is resolved pursuant to the Dispute Resolution Provision of the Contract;

2.   The Parties are compelled to comply with the provisions of the Dispute Resolution Provision of the Contract to address the propriety of the March 18, 2009 termination and the issues raised in the Verified Complaint.

3.   During the course of the Dispute Resolution process AT&T must continue doing business with plaintiff pursuant to the provisions of the Contract (as that term is defined in the Verified Complaint) until a final decision is made as to all issues pursuant to this process.

4.   Granting such other relief as the court deems equitable and just.

And it is further ORDERED that pending the return date herein, the defendant is temporarily enjoined and restrained as follows:

2

1.   AT&T must continue doing business with plaintiff pursuant to the provisions of the Agreement and immediately reinstate and re-activate all Dealer Codes.

And it is further ORDERED that:

1. The defendant may move to dissolve or modify the temporary restraints herein contained on two (2) days notice to the plaintiff's attorneys, Broderick, Newmark & Grather.

2. A copy of this Order To Show Cause, Verified Complaint, legal memorandum and any supporting Affidavits or Certifications submitted in support of this application be served upon the defendant *[personally or alternate: describe form of substituted service]* within _____ days of the date hereof, in accordance with R.4:4-3 and R.4:4-4, this being original process.

3. The plaintiff must file with the court its proof of service of the pleadings on the defendant no later than three (3) days before the return date.

4. Defendant shall file and serve a written response to this Order To Show Cause and the request for entry of injunctive relief and proof of service by _____, 2009. The original documents must be filed with the Clerk of the Superior Court in the county listed above. A list of these offices is provided. You must send a copy of your opposition papers directly to Judge Catherine M. Langlois, P.J.Ch.Div., whose address is Washington & Court

3

Streets, P.O. Box 910, Morristown, New Jersey 07963-0910. You must also send a copy of your opposition papers to the plaintiff's attorney whose name and address appears above, or to the plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file your opposition and pay the required fee of $135.00 and serve your opposition on your adversary, if you want the court to hear your opposition to the injunctive relief the plaintiff is seeking.

5. The plaintiff must file and serve any written reply to the defendant's Order To Show Cause opposition by _____, 2009. The reply papers must be filed with the Clerk of the Superior Court in the county listed above and a copy of the reply papers must be sent directly to the chambers of Judge Catherine M. Langlois, P.J.Ch.Div.

6. If the defendant does not file and serve opposition to this Order To Show Cause, the application will be decided on the papers on the return date and relief may be granted by default, provided that the plaintiff files a proof of service and a proposed form of Order at least three days prior to the return date.

7. If the plaintiff has not already done so, a proposed form of Order addressing the relief sought on the return date (along with a self-addressed return envelope with return address and postage) must be submitted to the court no later than three (3) days before the return date.

4

8.  Defendant take notice that the plaintiff has filed a lawsuit against you in the Superior Court of New Jersey. The Verified Complaint attached to this Order To Show Cause states the basis of the lawsuit. If you dispute this Complaint, you, or your attorney, must file a written Answer to the Complaint and proof of service within 35 days from the date of service of this Order To Show Cause; not counting the day you received it.

These documents must be fled with the Clerk of the Superior Court in the county listed above. A list of these offices is provided. Include a $135.00 filing fee payable to the "Treasurer State of New Jersey." You must also send a copy of your Answer to the plaintiff's attorney whose name and address appear above, or to the plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve your Answer (with the fee) or judgment may be entered against you by default. Please note: Opposition to the Order To Show Cause is not an Answer and you must file both. Please note further: if you do not file and serve an Answer within 35 days of this Order, the Court may enter a default against you for the relief plaintiff demands.

9.  If you cannot afford an attorney, you may call the Legal Services office in the county in which you live. A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of

5

these numbers is also provided.

10. The Court will entertain argument, but not testimony, on the return date of the Order to Show Cause, unless the court and parties are advised to the contrary no later than _____ days before the return date.

_____
CATHERINE M. LANGLOIS, P.J.Ch.Div.

6

ATLANTIC COUNTY:
Deputy Clerk of the Superior Court
Civil Division, Direct Filing
1201 Bacharach Blvd., First Fl.
Atlantic City, NJ 08401

LAWYER REFERRAL
(609) 345-3444
LEGAL SERVICES
(609) 348-4200

BERGEN COUNTY:
Deputy Clerk of the Superior Court
Case Processing Section, Room 119
Justice Center, 10 Main St.
Hackensack, NJ 07601-0769

LAWYER REFERRAL
(201) 488-0044
LEGAL SERVICES
(201) 487-2166

BURLINGTON COUNTY:
Deputy Clerk of the Superior Court
Central Processing Office
Attn: Judicial Intake
First Fl., Courts Facility
49 Rancocas Rd.
Mt. Holly, NJ 08060

LAWYER REFERRAL
(609) 261-4862
LEGAL SERVICES
(609) 261-1088

CAMDEN COUNTY:
Deputy Clerk of the Superior Court
Civil Processing Office
1st Fl., Hall of Records
101 S. Fifth St.
Camden, NJ 08103

LAWYER REFERRAL
(856) 964-4520
LEGAL SERVICES
(856) 964-2010

CAPE MAY COUNTY:
Deputy Clerk of the Superior Court
9 N. Main Street
Box DN-209
Cape May Court House, NJ 08210

LAWYER REFERRAL
(609) 463-0313
LEGAL SERVICES
(609) 465-3001

CUMBERLAND COUNTY:
Deputy Clerk of the Superior Court
Civil Case Management Office
Broad & Fayette Sts., P.O. Box 615
Bridgeton, NJ 08302

LAWYER REFERRAL
(856) 692-6207
LEGAL SERVICES
(856) 451-0003

ESSEX COUNTY:
Deputy Clerk of the Superior Court
50 West Market Street
Room 131
Newark, NJ 07102

LAWYER REFERRAL
(973) 622-6207
LEGAL SERVICES
(973) 624-4500

GLOUCESTER COUNTY:
Deputy Clerk of the Superior Court
Civil Case Management Office
Attn: Intake
First Fl., Court House
1 North Broad Street, P.O. Box 129
Woodbury, NJ 08096

LAWYER REFERRAL
(856) 848-4589
LEGAL SERVICES
(856) 848-5360

HUDSON COUNTY: Deputy Clerk of the
Superior Court
Superior Court, Civil Records Dept.
Brennan Court House— 1st Floor
583 Newark Ave.
Jersey City, NJ 07306

LAWYER REFERRAL
(201) 798-2727
LEGAL SERVICES
(201) 792-6363

HUNTERDON COUNTY:
Deputy Clerk of the Superior Court
Civil Division
65 Park Avenue
Flemington, NJ 08822

LAWYER REFERRAL
(908) 735-2611
LEGAL SERVICES
(908) 782-7979

MERCER COUNTY:
Deputy Clerk of the Superior Court
Local Filing Office, Courthouse
175 S. Broad Street, P.O. Box 8068
Trenton, NJ 08650

LAWYER REFERRAL
(609) 585-6200
LEGAL SERVICES
(609) 695-6249

MIDDLESEX COUNTY:
Deputy Clerk of the Superior Court
Administration Building
Third Floor
1 Kennedy Sq., P.O. Box 2633
New Brunswick, NJ 08903-2633

LAWYER REFERRAL
(732) 828-0053
LEGAL SERVICES
(732) 249-7600

MONMOUTH COUNTY:
Deputy Clerk of the Superior Court
Court House
71 Monument Park
P.O. Box 1269
Freehold, NJ 07728-1269

LAWYER REFERRAL
(732) 431-5544
LEGAL SERVICES
(732) 866-0020

MORRIS COUNTY:
Deputy Clerk of the Superior Court
Civil Division
30 Schuyler Pl., P.O. Box 910
Morristown, NJ 07960-0910

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 285-6911

OCEAN COUNTY:
Deputy Clerk of the Superior Court
Court House, Room 119
118 Washington Street
Toms River, NJ 08754

LAWYER REFERRAL
(732) 240-3666
LEGAL SERVICES
(732) 341-2727

PASSAIC COUNTY:
Deputy Clerk of the Superior Court
Civil Division
Court House
77 Hamilton St.
Paterson, NJ 07505

LAWYER REFERRAL
(973) 278-9223
LEGAL SERVICES
(973) 345-7171

**SALEM COUNTY:**
Deputy Clerk of the Superior Court
92 Market St., P.O. Box 18
Salem, NJ 08079

**SOMERSET COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
New Court House, 3rd Fl.
P.O. Box 3000
Somerville, NJ 08876

**SUSSEX COUNTY:**
Deputy Clerk of the Superior Court
Sussex County Judicial Center
43-47 High Street
Newton, NJ 07860

**UNION COUNTY:**
Deputy Clerk of the Superior Court
1st Fl., Court House
2 Broad Street
Elizabeth, NJ 07207-6073

**WARREN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
Court House
413 Second Street
Belvidere, NJ 07823-1500

LAWYER REFERRAL
(856) 935-5628
LEGAL SERVICES
(856) 451-0003

LAWYER REFERRAL
(908) 685-2323
LEGAL SERVICES
(908) 231-0840

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 383-7400

LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 354-4340

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 475-2010

**3**

# BRODERICK, NEWMARK & GRATHER

A PROFESSIONAL CORPORATION

## ATTORNEYS AT LAW

20 SOUTH STREET

SUITE 3

MORRISTOWN, N.J. 07960

(973) 538-0084

FAX (973) 538-2509

www.bnglawyers.com

EDWARD F. BRODERICK, JR.*
MARTIN NEWMARK
FRANCIS G. GRATHER*
ALAN J. BALDWIN*

* CERTIFIED BY THE SUPREME COURT
OF N.J. AS A CIVIL TRIAL ATTORNEY
* FELLOW AMERICAN ACADEMY OF
MATRIMONIAL LAWYERS

E. F. BRODERICK (1929-1987)
I. EZRA NEWMARK (1925-1979)

March 20, 2009

Honorable Catherine Langois
Chambers, Morris County Courthouse
Morristown, NJ 07960

My Dear Judge,

The undersigned represents Eastern Regional Communications, Inc. (ERC), which is the Dealer under a certain Exclusive Dealer Agreement effective March 19, 2006 between ERC and AT&T's predecessor, Cingular Wireless II, LLC. Would you kindly accept this letter in lieu of a more formal Brief in support of ERC's application for a Temporary Restraining Order.

In support of this Application, we are submitting on behalf of ERC as Plaintiff, a Verified Complaint, with Exhibits, as well as an Order to Show Cause Including Temporary Restraints.

As reflected in the Agreement referred to above, ERC has been authorized by AT&T (which succeeded to the rights of Cingular Wireless II, LLC as a result of the acquisition by Cingular of the AT&T business) to use the trade name, trademark and service mark of AT&T in connection with the marketing of AT&T goods and services, more particularly cell phones. Accordingly, the arrangement is one of "Franchise" as that term is defined in the New Jersey Franchise Act NJSA 56:10-3, as follows:

As used in this act:

a.   "Franchise" means a written arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and in which there is a community of interest in the marketing of goods or services in wholesale, retail, by lease agreement, or otherwise.

Accordingly, regardless of whether the Agreement describes the relationship as that of Franchisee and Franchisor, or indeed regardless of whether the Agreement attempts to contradict that relationship, the Agreement by its very terms falls within the statutory definition and as a result ERC as a Franchisee is entitled to all the protection afforded by the Franchise Act.

The Franchise Act, more particularly NJSA 56:10-5, makes it a violation on the part of the Franchisor to terminate or fail to renew a franchise without having first given written notice to the Franchisee setting forth all of the reasons for such termination or intent not to renew, 60 days in advance of such termination or failure to renew. In consequence of the foregoing, the March 19, 2006 Agreement between the parties continues in full force in effect, not withstanding its term was limited to two years. The ongoing viability of the Agreement seems to have been acknowledged by AT&T's representative, Robert Rizzi, who references the Agreement in his March 18, 2009 letter which purported to terminate the relationship. See letter attached to the Verified Complaint as Exhibit B.

As reflected in the Verified Complaint, the purported termination of the relationship by AT&T has been devastating and has the potential to have irreparable consequences. The Plaintiff maintains 27 stores in the New York-New Jersey Metropolitan area from which the AT&T product is sold exclusively in accordance with

the Agreement between the Plaintiff and AT&T.  In reliance on that Agreement, the Plaintiff has not only entered into contractual relationships with third parties which would be jeopardized in consequence of the unjustified and premature attempt to terminate the Agreement by AT&T, but in addition thereto the Plaintiff has entered into 27 Lease Agreements for space from which the various businesses are conducted.  The termination of the relationship will clearly frustrate the ability of the Plaintiff to maintain those leases in place.  Moreover, the Plaintiff maintains an inventory of in excess of $200,000 worth of cell phone products purchased from AT&T which they will be unable to sell if the termination is not promptly rescinded.  As reflected in the Verified Complaint, the reality of the situation is that the Plaintiff will be unable to continue its business while it litigates what it considers to be the unjustified and premature termination of the Agreement by AT&T, because AT&T has abruptly cancelled the so-called dealer codes which enable the Plaintiff, upon the sale of a cell phone, to activate that phone into the AT&T system.  Since the code has been cancelled, no phones can be sold and the Plaintiff is effectively out of business.  Indeed, the Plaintiff has, in fact, cancelled the dealer codes and the Plaintiff is effectively out of business until such time as this Court directs the AT&T to reactivate the codes.

The Court's attention is directed to Section 11 of the Agreement which entitles the Plaintiff as Dealer to dispute the purported termination of the relationship by a multi-step dispute resolution procedure as outlined in Section 11, including but not limited to all of the mandatory pre-arbitration dispute resolution procedures set forth in 11.2 and should that procedure be unavailing, to proceed to arbitration of the dispute.  Annexed to the Verified Complaint the Court will find a letter directed to AT&T's counsel invoking

the procedures provided for in Section 11 of the Agreement. Regrettably, AT&T's counsel has advised that his client is unwilling to withdraw the termination and reactivate the dealer codes even without prejudice, while the parties either attempt to resolve their differences or litigate the issue in an appropriate forum.

The Court is well aware of the criteria which justify the issuance of a Temporary Restraining Order, set forth in the seminal case of Crowe v. DeGioia, 90 NJ 126(1982). A preliminary injunction should not issue unless it is necessary to prevent irreparable harm. Harm is considered irreparable in equity if it cannot be adequately redressed by monetary damages. Accordingly, a Court will intervene to protect the subject matter of a law suit from destruction, loss or impairment in order to prevent the ultimate decree of the Court upon the merits from becoming futile in operation. Guangione v. Grangione, 97NJEq.303(e&a1925). Here in the absence of immediate interim relief the Plaintiff's business will effectively be destroyed.

This second principle is that temporary relief should ordinarily be withheld when the legal right underlying the Plaintiff's claim is unsettled. Here, however, the underlying legal claim, i.e. the entitlement of the Plaintiff to invoke the alternate dispute resolution procedures set forth in the Contract between the parties is undeniable. The Contract clearly affords the Plaintiff the rights which it wishes to invoke and which it is asking this Court to specifically enforce. That AT&T may consider the Plaintiff to be in breach of the Agreement begs the question of whether they are entitled to abruptly terminate that Agreement when the very Agreement gives the Plaintiff the right to have an adjudication of the propriety of the termination through an arbitration procedure.

The third rule is that a preliminary injunction should not issue where all the material facts are controverted. Here again the underlying facts which support the Plaintiff's entitlement to invoke the alternate dispute resolution procedures set forth in the Agreement between the parties – which Agreement was prepared by AT&T and which was not subject to negotiation – are not subject to legitimate dispute. The Contract speaks for itself. Under the Franchise Act it did not expire but remains in full force and effect and the entitlement of the Plaintiff to invoke the alternate dispute resolution provisions of the Agreement are clear and unambiguous. Nor, can the AT&T dispute that the Plaintiff attempted without success to invoke the procedure and achieve a consensual stay of execution. Moreover, the requirement that the preliminary injunction would not issue where all material facts are controverted is tempered by the principle that mere doubt as to the validity of the claim is not an adequate basis for refusing to maintain the status quo. See Naylor v. Harkins, 11 NJ 435(1953). The whole purpose of temporary relief is to maintain the parties in substantially the same condition when the final decree is entered as when the litigation began.

The final test in considering the granting of a Temporary Restraining Order is the relative hardship to the parties in granting or denying the relief. Although AT&T may argue that the alleged fraud upon which it bases its right to terminate the Agreement is causing it harm, the harm, if any, suffered by AT&T if, in fact, some fraud were to occur, is inconsequencial compared to the fact that the cancellation of the dealer code and the termination of the Agreement by AT&T effectively puts the Plaintiff out of business and will cause it to be in breach of several anciliary agreements.

Based upon the foregoing, it is respectfully submitted that the Plaintiff has demonstrated an entitlement to the Temporary Restraining Order it seeks.

The Plaintiff recognizes that unpublished Opinions do not constitute precedent nor are they binding on the Court. R.1:36-3. On behalf of the Plaintiff, however, we submit the unpublished Appellate Division Decision in House of Cell Phones, Inc. v. Sprint Solutions, Inc., 2008WL1848579. A copy of this Opinion has been forwarded to and received by AT&T's counsel. As the Court will note the facts are strikingly similar as those presented to the Court here. The case involves the appeal by Sprint Solutions, Inc. of an Order granting a Temporary Restraining Order and Preliminary Injunction in favor of the Plaintiff which precluded the termination of the parties' Authorized Representative Agreement and required Sprint to continue performance thereunder until the matter was resolved in accordance with the dispute resolution provide for in the Agreement between the parties. More specifically the preliminary injunction directed that Sprint may not terminate the Plaintiff for cause under the Authorize Representative Agreement unless and until the Plaintiff's dispute regarding the propriety of that determination is resolved pursuant to the dispute resolution provisions of the Agreement. The Order went on to require the parties to comply with the provisions of the dispute resolution as set forth in the Agreement and further required that during the course of the dispute resolution process, Sprint must continue doing business with House of Cell Phones in accordance with the Contract until a final decision was made as to all issues pursuant to that process.

As the Court will note in reviewing that decision, the dispute resolution process provided for in the House of Cell Phones case are similar to those provided for in the

agreement between the Plaintiff and AT&T here.   Both   Agreements contemplate

negotiation, remediation and arbitration.  The Court held that a "dispute" contemplated

by the Agreement included the termination of the same.  The claims by House of Cell

Phones which gave rise to the issuance of the Temporary Restraining Order are the same

as those set forth herein.  i.e. That immediate termination would put the Plaintiff out of

business because it only sold Sprint services and products and the termination of the

Agreement would prevent the Plaintiff from paying its employees and subcontractors.

As indicated the trial court granted the Temporary Restraining Order  and the

Appellate Division affirmed.  It found that all the prongs of the DeGoia test had been

met.  The injunction was necessary to prevent irreparable harm, The underlying legal

right was clear.   The Plaintiff had made a preliminary showing of a reasonable

probability of success on the merits and the relative hardships weighted favorably in

favor of the Plaintiffs.

For the reasons set forth above and for the reasons set forth by the Court in the

House of Cell Phones case, this Court should enter the Order to Show Cause with the

preliminary restraints requested so that the status quo is being  maintained and

irreparable harm is avoided while the rights of the parties are sorted out.  Clearly, any

adverse consequences to AT&T, if the relief sought by the Plaintiff is granted, is not

nearly as significant as the adverse consequence to the Plaintiff if the relief sought were

to be denied.

Respectfully submitted,


Martin Newmark